**McDONALD'S CORPORATION, Appellant,**

v.

**Louise OGBORN, Donna J. Summers, and Kim Dockery, Appellees.**

No. 2008–CA–000024–MR.

Court of Appeals of Kentucky.

Nov. 20, 2009.

Rehearing Denied Jan. 25, 2010.

Steven T. Catlett (argued), Chicago, IL, Margaret E. Keane and James W. Herr (argued), Louisville, KY, for appellant.

Ann Oldfather (argued), Kirsten R. Daniel, Vicki L. Buba, Louisville, KY, for appellee, Louise Ogborn.

Glenn Cohen (argued), Paul J. Hershberg, Cynthia L. Effinger, Louisville, KY, for appellee, Donna J. Summers.

Frank Hampton Moore, Jr., Matthew P. Cook, Bowling Green, KY, for appellee, Kim Dockery.

Before ACREE, TAYLOR and THOMPSON, Judges.

## OPINION

ACREE, Judge.

The defendant below, McDonald's Corporation, appeals the November 15, 2007, judgment of the Bullitt Circuit Court awarding both compensatory and punitive damages to Louise Ogborn, the plaintiff below, and Donna J. Summers, a defendant and cross-claimant below. We affirm the judgment of the Bullitt Circuit Court except as to the punitive damages awarded to Summers, which we reduce to comport with constitutional due process.[1]

### I. *Facts and Procedure*

Between 1994 and 2004, an unknown individual placed a series of hoax telephone calls to McDonald's and other fast food restaurants, pretending to be a police officer. During that time, he convinced restaurant managers, employees, and third parties to conduct strip searches and even sexual assaults at his direction.[2] The

---

1. Though Kim Dockery is an appellee and filed a brief in this case, McDonald's presented no argument relative to the judgment in favor of Dockery.

2. The experts in this case uniformly agreed that, as astonishing as these events seem, they occurred because of a strong human instinct to obey perceived authority.

caller was successful in accomplishing his perverse hoax more than thirty times at different McDonald's restaurants alone, including several in Kentucky.[3]

McDonald's corporate legal department was fully aware of these hoaxes and had documented them. The evidence supports the reasonable conclusion that McDonald's corporate management made a conscious decision not to train or warn store managers or employees about the calls. The evidence further supports the finding that proper training or warning would have prevented successful repetition of the hoaxes.

On April 9, 2004, eighteen-year-old Louise Ogborn had just finished her afternoon shift as an employee at the Mt. Washington, Kentucky, McDonald's restaurant when a manager asked her to work a second shift to fill in for an absent employee. She agreed to do so after she finished a meal the restaurant provided to its employees under such circumstances.

Shortly thereafter, an unknown individual telephoned the restaurant and assistant manager Donna Summers answered. The caller falsely identified himself as a police officer and claimed to be investigating a recent theft of a purse or wallet at the restaurant. According to the caller, the perpetrator was a McDonald's employee. He described a female suspect which Summers believed fit Ogborn. Ogborn was summoned to the office and informed that she was the subject of an "investigation" into this theft. The series of events that unfolded thereafter lasted more than three hours.

At the instruction of the caller, Summers told Ogborn she had two choices: she could be searched in the office by her managers or at the police station after arrest. After speaking with the caller, Ogborn agreed to be searched in the office. In accordance with the caller's detailed instructions, Ogborn was methodically searched as she was convinced to gradually disrobe. Summers took Ogborn's clothes, cell phone and other belongings, and removed them from the office. The assistant manager who was to replace Summers for the evening shift, Kim Dockery, soon arrived and provided Ogborn with an apron to cover her, but then returned to management duties outside the office.

The caller then instructed Summers to summon a male employee to sit with Ogborn during the investigation. Following instructions, Summers left the office and returned with a cook, Jason Bradley. Bradley spoke to the caller and after several minutes left the office, informing Summers, in appropriately strong, colloquial language, that the situation was unacceptable. However, he took no further action and returned to his work.

Undaunted, the caller asked Summers if she was married. She responded that although she was unmarried, she was engaged. The caller then instructed Summers to have her fiancé, Walter Nix,[4] come to the office and stay with Ogborn. Summers called Nix, who soon arrived.

Without questioning the propriety of doing so, Summers left Nix largely alone in the office with Ogborn, who was still naked but for the apron she held in front of herself. Summers and Dockery periodically, but only briefly, returned to the manager's office. Nix, acting on the instruction and encouragement of the caller, forced Ogborn to perform a series of humiliating physical acts, conducted a cavity

---

**3.** Hoax calls were made to the Kentucky McDonald's restaurants in Somerset, Williamsburg, Leitchfield, Louisa, and Paintsville.

**4.** Nix was not a McDonald's employee.

search of her body, engaged in the additional physical assault of spanking her, and ultimately sexually assaulted her. After nearly two hours, Nix left the restaurant and Summers resumed control of the situation. Summers was not aware until later that her fiancé had physically and sexually assaulted her employee.

While Ogborn was detained naked in the office and subjected to these searches and assaults, she continuously expressed her strenuous objection to the search, asked for her clothes, and requested permission to leave. Her requests evoked some sympathy from her managers but were ultimately denied.

Summers then brought into the office a McDonald's maintenance employee, Tom Simms, to take the phone, speak with the caller, and sit with Ogborn. After a while, Simms and several other employees appropriately assessed the call and the caller as a fraud. The hoax having been revealed, the call was terminated. Summers' supervisor, Lisa Siddons, was called. When Siddons arrived, she called the police.

McDonald's terminated Summers' employment. Nix was found guilty and imprisoned on three felony indictments. Summers entered an *Alford* plea [5] to a misdemeanor charge. David Stewart, a Florida security guard with no affiliation to McDonald's, was suspected as the hoax caller and was charged with felonies related to the incident at the Mt. Washington McDonald's restaurant; Stewart was eventually acquitted.

Both Ogborn and Summers underwent counseling. The psychological impact on Ogborn manifested in significant physical and behavioral changes.

Ogborn filed suit against McDonald's, Summers, and Dockery. McDonald's responded with a third-party complaint for indemnity against Nix. Summers also filed a cross-complaint against McDonald's. Seeking to impose liability on the caller, McDonald's filed a third-party complaint against David Stewart. However, after Stewart was acquitted in his criminal trial, allegations focused on an "unknown" caller. Significantly, McDonald's did not pursue a third-party claim against the unknown caller.[6]

A lengthy period of discovery revealed substantial evidence that McDonald's corporate legal department was aware of the many similar previous incidents at its restaurants but chose not to train or warn restaurant employees so as to prevent future incidents. This evidence was presented to the jury.

At the close of the evidence, the jury found for Ogborn and against McDonald's on Ogborn's claims of sexual harassment, false imprisonment, premises liability, and negligence. The jury awarded Ogborn $1,111,312.00 in compensatory damages and $5,000,000.00 in punitive damages.

The jury also found against McDonald's on Summers' claim for Intentional Infliction of Emotional Distress (IIED), awarding her $100,000.00 in compensatory damages and $1,000,000.00 in punitive damages.

On Summers' claims and Ogborn's claims the jury apportioned damages 50 percent to McDonald's and 50 percent to the unknown caller who was a non-settling non-party. No apportionment instruction was submitted to the jury or requested for Stewart. The circuit court entered a judg-

---

5. *See North Carolina v. Alford*, 400 U.S. 25, 91 S.Ct. 160, 27 L.Ed.2d 162 (1970), and Kentucky Rules of Criminal Procedure (RCr) 8.09.

6. *See, infra,* footnote 16 relating to Kentucky Rule(s) of Civil Procedure (CR) 4.15, captioned, "Unknown defendant."

ment imposing all damages awards against McDonald's without apportionment. This appeal followed.

## II. McDonald's Arguments

McDonald's arguments fall into three categories: (1) those pertaining only to Ogborn; (2) those pertaining only to Summers; and (3) those pertaining to both Ogborn and Summers. We address the arguments in those categories.

## III. Arguments Pertaining Only to Ogborn

Regarding Ogborn's judgment, McDonald's appeals on the following grounds:

A. The Kentucky Worker's Compensation Act provides Ogborn's "sole remedy" and the trial court "had no jurisdiction to hear Ogborn's claims";

B. The Kentucky Civil Rights Act preempts Ogborn's claims;

C. Ogborn's Kentucky Civil Rights Act claim fails as a matter of law because McDonald's cannot be liable for a nonemployee's conduct, and the McDonald's employees were found not negligent;

D. The evidence does not support Ogborn's false imprisonment claim;

E. Ogborn's premises liability claim fails as a matter of law;

F. Ogborn's negligence claim fails as a matter of law;

G. Nix's unforeseeable criminal acts function as an intervening cause which prevents the imposition of liability to McDonald's;

H. The evidence did not support an award of punitive damages under Kentucky Revised Statutes (KRS) 411.184(3).

The merits of these arguments are not sufficient to reverse the judgment in favor of Ogborn. We consider each of these arguments in turn.

## A. Workers' Compensation Act Does Not Preclude Ogborn's Pursuit of Common Law Causes of Action

■ McDonald's argues, by virtue of KRS 342.690(1), that the liability of an employer under the Workers' Compensation Act is exclusive and in place of all other liability. KRS 342.610(1). We believe McDonald's waived this argument.

From the aforementioned provisions of the Workers' Compensation Act, McDonald's reasons that Ogborn's employment with McDonald's divested the trial court of jurisdiction to adjudicate Ogborn's claims. "In our view, this construction of the statute is erroneous for it confuses a defensive plea with want of jurisdiction." *Gordon v. NKC Hospitals, Inc.*, 887 S.W.2d 360, 363 (Ky.1994).

■ As made clear in *Gordon*,

we have no doubt that the matters claimed to protect [the employer] are affirmative defenses which were required to have been pleaded *and proven*, the failure of which amounts to a waiver. CR 8.03 and CR 12.02.

*Id.* (emphasis supplied). In order to prove the affirmative defense that McDonald's was entitled to protection of the Workers' Compensation Act's exclusivity provisions, KRS 342.690(1), McDonald's was required to prove that it complied with KRS 342.340(1). In pertinent part, this statute states,

Every employer under this chapter shall either insure and keep insured his liability for compensation hereunder in some corporation, association, or organization authorized to transact the business of workers' compensation insurance in this state or shall furnish to the executive director satisfactory proof of his financial ability to pay directly the compensa-

tion in the amount and manner and when due as provided for in this chapter.

KRS 342.340(1). Whether the employer complied with KRS 342.340(1) is a question of jurisdictional fact; proof of compliance with the statute is a jurisdictional requirement. *General Elec. Co. v. Cain*, 236 S.W.3d 579, 605 (Ky.2007) ("GE proved that it had complied with KRS 342.340(1) by producing a certification from the Department of Workers' Claims that GE had workers' compensation insurance during the relevant time period.").

McDonald's, both before the trial court and now on appellate review, skipped directly to the legal argument that Ogborn was "acting within the scope and course of her employment." However, as noted in *Gordon,*

> The statutory provisions upon which [the employer] relies are not self-executing. To have protection of the Act, KRS 342.690 requires an employer to secure payment of compensation as a condition of benefiting from the exclusive liability provision. As the employer has this duty and the statute contemplates the possibility that it may not be fulfilled in which case there is a right to sue (KRS 342.690(2)), necessarily *the employer must* inform the court of its status as such and *prove its compliance with the statute.*

*Gordon,* 887 S.W.2d at 362 (emphasis supplied); *see also General Elec. Co. v. Cain,* 236 S.W.3d at 585 (defendant "who asserts exclusive remedy immunity must both plead and prove the affirmative defense"); *and Becht v. Owens Corning Fiberglas*

*Corp.*, 196 F.3d 650, 654 (6th Cir.1999), citing *Gordon* at 362 (employer "did not introduce any evidence to prove that it 'secure[d] payment of compensation' as required by KY.REV.STAT. ANN. § 342.690(1)").

While McDonald's did affirmatively plead this defense, nothing was submitted to the trial court to prove the jurisdictional fact that McDonald's complied with KRS 342.340(1).[7] CR 43.01(1)("The party holding the affirmative of an issue must produce the evidence to prove it."). *General Elec. Co. v. Cain* illustrates the proper sequence for establishing the defense and countering it.

> A certification of coverage from the Department of Workers' Claims or an uncontroverted affidavit from the employer's insurer is prima facie proof that a company has secured payment of compensation for the purposes of KRS 342.690(1). Absent evidence that the coverage was in some way deficient as to a worker, such a showing is enough to invoke the exclusive remedy provision of KRS 342.690(1), if applicable.

*General Elec. Co. v. Cain,* 236 S.W.3d at 605. McDonald's should have presented satisfactory prima facie evidence of coverage, thereby shifting the burden to Ogborn to argue that the facts of her case take it outside the exclusivity provisions of the Workers' Compensation Act. McDonald's failed to do so and, consequently, the argument that the Workers' Compensation Act provided Ogborn with her sole remedy was waived.

---

7. McDonald's stated in its Reply Brief, p. 1 fn 1, that it "preserved all issues related to Workers' Compensation Act preemption at VR: 9/24/07; 9:52:57–09:53:20, 10/2/07; 01:32:31–01:33:20; and R. at 06526–06533." We found no offer of proof of the jurisdictional fact there. We also searched other parts of the record, including all submissions in support of McDonald's initial and renewed motions for summary judgment (R. at 06417–06421, 06510–06585, and 10635–11001), but failed to find any proof that McDonald's complied with KRS 342.340.

■ When an issue on appeal has been "insufficiently raised or preserved for review[,]" this Court may still grant the requested relief "upon a determination that manifest injustice has resulted from the error." CR 61.02; *see also Elwell v. Stone,* 799 S.W.2d 46, 47–8 (Ky.App.1990) (relating to CR 76.12(4)(c)(iv), now CR 76.12(4)(c)(v)). In our search for manifest injustice in this case, we noted that McDonald's argued that Ogborn's injuries "arose out of and in the course of employment." The relevant facts bearing on this issue were not in dispute. Our review shows that the trial court attentively listened to McDonald's application of those facts to its legal argument. We believe the trial court gave adequate consideration to all aspects of the argument, then concluded that Ogborn's assault did not occur "in the course of employment."

The trial court specifically stated that, in addition to other evidence, it was specifically relying on the testimony of Ogborn's supervisor, Donna Summers, and Summers' supervisor, Lisa Siddons, as well as the fact that Ogborn "clocked out" before any of the events giving rise to her causes of action occurred.[8] We do not believe either that the trial court based its decision on any single factor, or that it gave undue consideration to any single factor. We do not find manifest injustice in the trial court's ruling that Ogborn was not acting in the scope and course of her employment while she was held in the manager's office. Therefore, she was not precluded by the Workers' Compensation Act from asserting her claims in Bullitt Circuit Court.

## B. *Kentucky Civil Rights Act (KCRA) Does Not Preempt Ogborn's Claims*

McDonald's argues that "under settled law, where common law claims and KCRA claims arise from the same set of facts and circumstances, or where the KCRA intends to cover such injuries, plaintiffs may not pursue both sets of claims." To support this argument, McDonald's directs us to three published opinions: *Grzyb v. Evans,* 700 S.W.2d 399 (Ky.1985); *Messick v. Toyota Motor Mfg., Kentucky, Inc.,* 45 F.Supp.2d 578 (E.D.Ky.1999); and *Wilson v. Lowe's Home Ctr.,* 75 S.W.3d 229 (Ky. App.2001). We believe none of these cases supports McDonald's argument.

■ *Grzyb* was rendered by the Kentucky Supreme Court to clarify an apparent "misunderstanding of the meaning of" *Firestone Textile Co. Div., Firestone Tire and Rubber Co. v. Meadows,* 666 S.W.2d 730 (Ky.1983). That misunderstanding had culminated in this Court's impermissible extension of exceptions to the terminable-at-will doctrine. *Grzyb* at 400. McDonald's cites *Grzyb,* however, for a more general principle: "Where [a] statute both declares the unlawful act and specifies the civil remedy available to the aggrieved party, the aggrieved party is limited to the remedy provided by the statute." *Id.* at 401. The question is whether that general principle applies in this case. If so, Ogborn should have been limited to a claim under KCRA. We believe the general principle does not apply in this case.

Ogborn recovered on the common law claims of premises liability, negligence, and false imprisonment. Unlike claims based on discriminatory employment, housing discrimination, and similar practices, these

---

8. Ogborn "clocked out" at 4:44 p.m. The videotape shows Summers answered the hoax call at approximately 4:56 p.m. Ogborn entered the office shortly thereafter and remained there until past 9:00 p.m. The evidence showed that an unknown employee subsequently went into McDonald's computer system and clocked Ogborn back in at 5:16 p.m.

causes of action stand independently and were not subsumed by KCRA. The elements of the common law causes of action bear no resemblance to those intended to be embraced by the KCRA. We have been directed to no authority contradicting that view. Therefore, the judgment in favor of Ogborn on these claims is unaffected by *Grzyb*.

Both *Wilson* and *Messick* properly apply the concept stated in *Grzyb*. That is because in both *Wilson* and *Messick*, the plaintiffs brought a common law claim for IIED while also pursuing a statutory claim under KCRA. We noted in *Wilson* that KRS 344.020(1)(b) allows " 'claims for damages for humiliation and personal indignity' [and that, s]imilarly, an IIED claim seeks damages for extreme emotional distress." *Wilson* at 239, quoting *McNeal v. Armour and Co.*, 660 S.W.2d 957, 958 (Ky. App.1983). Based on the identity of purpose and elements necessary to support each cause of action, we said,

> Wilson's IIED claim against [his employer] was subsumed by his KRS Chapter 344 claims. This same conclusion was reached by the federal court in *Messick v. Toyota Motor Manufacturing, Kentucky, Inc.*, 45 F.Supp.2d 578, 582 (E.D.Ky.1999).

*Wilson* at 239. Consequently, these cases simply stand for this well-established principle that when a plaintiff prosecutes a statutory discrimination claim under the KCRA and a common law claim of IIED, the former preempts the latter. *Id.; Messick* at 582; *see also Kroger Co. v. Buckley*, 113 S.W.3d 644, 646–47 (Ky.App.2003).

If Ogborn had pursued the IIED claim she originally alleged, it would have been subsumed by the KCRA. However, she did not. Instead, she recovered on the common law claims of premises liability, gen-

eral negligence, and false imprisonment. None of these common law claims is substantially similar to claims authorized by the KCRA, nor have they been subsumed by that Act.

### C. *Ogborn's KCRA Claim Does Not Fail As A Matter Of Law*

McDonald's argues that it was entitled to a directed verdict on Ogborn's KCRA claim because, on the one hand, it cannot be liable for the acts of nonemployees (Nix and the unknown caller) and, on the other hand, the jury's verdict that Summers and Dockery were not negligent insulates McDonald's from vicarious liability through them.

■ Ogborn does not dispute that McDonald's cannot be vicariously liable for the actions of the hoax caller, but does argue that Nix should be treated as McDonald's agent through whom liability can be imposed. However, we need not determine whether Nix was McDonald's agent. We hold that the jury's verdict that Summers and Dockery were not negligent is incommensurable with any determination of their employer's liability under KCRA.

■ McDonald's specifically argues that because Summers and Dockery were found not to be negligent under Instruction No. 1, the jury "actually affirmatively found that both of these McDonald's employees treated Ogborn with ordinary care[.]" This deduction is erroneous. A jury's finding of no negligence does not insulate anyone from liability for an independent claim of intentional tort or statutory violation. Instruction No. 1 only addressed the potential tort liability for negligence of Summers, Dockery and McDonald's.[9] Instruction No. 6 addressed an entirely separate cause of action based on KRS 344.040

---

9. McDonald's was found negligent independently under Instruction No. 2.

and the intentional acts of McDonald's employees, not their negligent acts.

Instruction No. 6,[10] captioned "Sexual Harassment Against McDonald's Corporation," set out the proper elements of a cause of action against the employer in this case. This instruction perfectly reflected Kentucky jurisprudence as clearly explained by our Supreme Court in *American Gen. Life & Accident Ins. Co. v. Hall*, 74 S.W.3d 688 (Ky.2002).

> We have consistently interpreted KRS 344.040 [the relevant statute in Ogborn's case] in consonance with Title VII of the Federal Civil Rights Act of 1964. *Bank One, Kentucky, N.A. v. Murphy*, 52 S.W.3d 540, 544 ([Ky.]2001); *Ammerman v. Bd. of Ed. of Nicholas County*, 30 S.W.3d 793, 797 ([Ky.]2000); *Meyers v. Chapman Printing Co.*, supra, [840 S.W.2d 814] at 821 [(Ky.1992)]. In *Burlington Industries Inc. v. Ellerth*, 524 U.S. 742, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998), the United States Supreme Court noted that "[s]exual harassment under Title VII presupposes intentional conduct." *Id.* at 756, 118 S.Ct. [at] 2266. In *Ellerth*, the Supreme Court held that with respect to a "hostile work environment" claim, *i.e.*, sexual harassment where no job action is threatened or taken (as opposed to a "quid pro quo" claim, where job action is offered, threatened or taken as a quid pro quo for a response to sexual advances), the vicarious liability of the employer is premised not on the employer's negligence but on the fact that the agent was aided in accomplishing the sexual harassment by the existence of the agency relationship. *Id.* at 758, 118 S.Ct. at 2267, citing Restatement (Second) of the Law of Agency, § 219(2)(d) (A.L.I.1957). In the companion case of *Faragher v. City of Boca Raton*, 524 U.S. 775, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998), the Court referred to this same principle as "vicarious liability for misuse of supervisory authority." *Id.* at 804–08, 118 S.Ct. at 2291–92. Both *Ellerth* and *Faragher* held that "[a]n employer is subject to vicarious liability to a victimized employee for an actionable hostile environment created by a supervisor with immediate (or successively higher) authority over the employee," subject to an affirmative defense that "(a) the employer exercised reasonable care to prevent and correct promptly any sexually harassing behavior, and (b) the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise." *Ellerth, supra,* at 765, 118 S.Ct. at 2270; *Faragher, supra,* at 807, 118 S.Ct. at 2293.

*American Gen. Life*, 74 S.W.3d at 691–92. Based on a proper jury instruction, McDonald's was found liable "to a victimized employee for an actionable hostile environment created by a supervisor with immediate (or successively higher) authority over the employee[.]" *Id.* at 692. Furthermore, the jury concluded that McDonald's failed to "exercise[ ] reasonable care to prevent and correct promptly any sexually harassing behavior[.]" *Id.*

---

**10.** In pertinent part, Instruction No. 6 allowed a finding in favor of Ogborn if the jury believed from the evidence that she "was subjected, because of her sex, to unwelcome sexual advances or verbal or physical contact of a sexual nature ... so severe and pervasive that it created a hostile and offensive work environment for a reasonable female [and] was a substantial factor in causing injury to Ogborn. . . . However, if [the jury found] that McDonald's took steps to prevent and promptly correct the behavior toward Ogborn [and] Ogborn unreasonably failed to take advantage of any preventative or corrective opportunities to avoid harm," then the jury could have found for McDonald's.

The fact that Summers and Dockery were not found liable for negligence does not prohibit the same acts from serving as the basis of a KCRA claim. After all, even McDonald's deemed Summers' behavior, including strip-searching Ogborn, sufficiently inappropriate to terminate her employment.

The actions of McDonald's employees, as clearly shown by the record, qualify as sexual harassment pursuant to the KCRA. A McDonald's employee compelled Ogborn to disrobe in a small office, deprived her of her clothing and other belongings, and allowed or enabled a total of four McDonald's employees and one nonemployee to view her in a state of undress. In such a case as this, the jury's verdict that Summers and Dockery were not negligent cannot cut off the vicarious liability of McDonald's for the intentional acts of its employees. Therefore, we do not find in this argument any basis for affecting the judgment.

### D. *The Evidence Supports Ogborn's Claim of False Imprisonment*

McDonald's contends that Ogborn's false imprisonment claim fails for two reasons: (1) Ogborn cannot establish that she was physically restrained or threatened by Summers; and (2) Ogborn voluntarily consented to be searched, precluding the claim of false imprisonment. We disagree. The record shows there was sufficient and substantial evidence to submit the case to the jury on this cause of action.

■■■■ Ogborn's evidence shows that she was, in fact, forcibly and unlawfully detained. "Our cases define an imprisonment as being any deprivation of the liberty of one person by another or detention for however short a time without such person's consent and against his will, whether done by actual violence, threats or otherwise." *Grayson Variety Store, Inc.*

*v. Shaffer,* 402 S.W.2d 424, 425 (Ky.1966) (citations omitted). Furthermore,

> Restraint constituting a false imprisonment may arise out of words, acts, gestures, or the like, which induce a reasonable apprehension that force will be used if the plaintiff does not submit. [citation omitted]

> On the other hand, submission to the mere verbal direction of another unaccompanied by force, or threats of any character, does not constitute false imprisonment.... Bare words are insufficient to effect an imprisonment if the person to whom they are spoken is not deprived of freedom of action.

*Ford Motor Credit Co. v. Gibson,* 566 S.W.2d 154, 155–56 (Ky.App.1977) (citation and internal quotation marks omitted).

■■■■ We focus on two things: the behavior of the alleged perpetrator and the reasonable apprehension of the alleged victim. On the continuum of what is and what is not false imprisonment, we know that actual physical restraint is sufficient and that "[b]are words are insufficient[.]" *Id.* Much between these two extremes constitutes sufficient evidence to justify presenting the issue to a jury.

In *Ashland Dry Goods Co. v. Wages,* 302 Ky. 577, 195 S.W.2d 312 (1946), a Mrs. Wages was accused of theft at a department store and told by a store manager, "You cannot leave the store[.]" *Ashland Dry Goods* at 313. When she tried to leave anyway, a manager grabbed the woman's purse. Wages said, "By that time my heart was beating so that I couldn't argue with her." *Id.* "[T]he incident caused her to become ill and nervous, to such an extent that she was forced to sit down and rest." *Id.* Our former Court of Appeals said,

> It is contended that the transactions as recited by the appellee do not amount to

false imprisonment, the theory being that appellee was in no way restrained and was at liberty to go her way. We are unable to agree with this contention since, although appellee probably was at liberty to leave the store at any time, and there is no evidence that she was forcibly restrained from doing so, the result of her departure would have been an automatic parting with her purse. It is natural to assume that the appellee, knowing her innocence, was most reluctant to leave the store without her purse and its contents. We are of the opinion that the retention of the purse and the statement by [the manager] that the appellee could not leave the store ... constituted an unlawful detention of the appellee without her consent and against her will, and that the court properly submitted this question to the jury.

*Ashland Dry Goods* at 314–15.

In *Bradshaw v. Steiden Stores, Inc.*, 265 S.W.2d 64 (Ky.1954), a store manager did nothing more than retain an uncashed check belonging to a Mrs. Bradshaw. The trial court directed a verdict against Bradshaw, but the former Court of Appeals was not so quick. "Under the doctrine of the Ashland Dry Goods Co. case Mrs. Bradshaw came very close to proving false imprisonment." *Bradshaw* at 65. The judgment was affirmed, but not because the evidence failed to support the false imprisonment claim. The Court believed "this a borderline case on that issue," but stated that even if it is "conceded that the evidence was sufficient to submit to the jury on that issue, it is apparent that Mrs. Bradshaw was entitled to no more than nominal damages [and] a judgment for the defendant will not be reversed where plaintiff is entitled to no more than nominal damages." *Id.*

Additionally in Ogborn's case, Ogborn was reacting to the threat of authority. We believe this threat had at least the same impact as a similar threat of authority described in *Louisville & N.R. Co. v. Vinson*, 310 Ky. 854, 223 S.W.2d 89 (Ky. 1949). In *Vinson,* as in the case before us, the detainee was falsely accused of theft. He allegedly stole golf clubs and was confronted on the golf course by an inspector for a railroad that ran adjacent to the course. There was no legal affiliation between the golf course and the railroad. The inspector claimed to be a detective and ushered Vinson to a car where other gentlemen waited inside. Vinson "was scared and regarded the statement 'Get into the car' as an officer's command." *Vinson,* 223 S.W.2d at 90.

> Vinson could reasonably have yielded to what he then reasonably understood to be an officer's command to get into the car and go with him. We do not think Vinson was required to stop and inquire whether this was within the scope of his official authority.... [W]e conclude there was sufficient evidence of an unlawful arrest, or what is more frequently and technically termed, "false imprisonment."

*Id.* at 91.

Ogborn's circumstances were more severe than any of these cases. She was not simply deprived of her purse or her uncashed check; she was deprived of all her clothes and all her other possessions. And Ogborn did not only face the false assertion of police authority, she also faced the real authority of her supervisors.

However, McDonald's still argues that the evidence shows Ogborn voluntarily stayed and consented to the search "to clear her name, save her job, and clear her parents' name" and that, as a matter of law, this is fatal to her claim. In support, McDonald's cites *Columbia Sussex Corp., Inc. v. Hay*, 627 S.W.2d 270 (Ky.App.1981), and the federal case of *Stump v. Wal–*

*Mart Stores, Inc.*, 942 F.Supp. 347 (E.D.Ky.1996). Both cases, however, are distinguishable.

In *Columbia Sussex*, a hotel was robbed and circumstances led management to believe the robber was aided by an employee. A number of employees, including Hay, were asked to take a lie detector test.

> Hay inquired of [the hotel's president] what would happen if they did not take the test. His answer was that they could leave, indicating that their jobs would be lost. Ultimately, each employee who was called took the polygraph examination. At the time that the tests were administered, each, including Mrs. Hay, signed a paper which acknowledged that the subject was taking the test under neither coercion nor duress. Mrs. Hay's testimony is that she did indeed submit under duress inasmuch as her job rested on such and that she informed the polygraph operator that her only lie was that she was taking it without coercion. The operator was not called.

*Columbia Sussex* at 273. Quoting William L. Prosser, *Handbook on the Law on Torts*, § 11, pp. 44–45 (4th ed. 1971), we said, "Moral pressure, as where the plaintiff remains with the defendant to clear himself of suspicion of theft . . . is not enough." Columbia Sussex at 277–78. We applied that concept to Mrs. Hay.

> [O]n the question of voluntariness, other than Mrs. Hay's denials . . . there was nothing to establish that the submission was *anything other than* voluntary. From the record the only indication of displeasure was her inquiry as to what would happen if [she] did not submit. The response, as noted, was that [her] job[ ] would be lost. Appellee then signed the release.

*Columbia Sussex* at 278.

Ogborn's circumstances were entirely different. She did not sign a release, she was deprived of her clothing, she repeatedly objected to the search and seizure of her body, she was threatened with further police involvement, she was under the impression the door had been locked, and she had a constant guard between herself and the door. We believe the evidence was entirely sufficient to conclude that more than "moral pressure" kept Ogborn in the office.

*Stump v. Wal–Mart Stores, Inc.*, 942 F.Supp. 347 (E.D.Ky.1996), presents even less support for McDonald's argument. The alleged detainee, Stump, "testified that she was never told she could not leave, but in fact was told to leave" stating, "he just kept trying to get me to leave the store and I wouldn't leave." *Stump* at 349, 350.

We hold that, based on this record, Ogborn presented sufficient evidence to allow the jury to decide whether she was falsely imprisoned.

### E. *Ogborn's Premises Liability Claim Does Not Fail As A Matter Of Law*

McDonald's argues premises liability claims must be based on some physical defect of real property or land and that such claims may not be based upon the actions of third parties. This is simply not the law in Kentucky. As explained in *Napper v. Kenwood Drive–In Theatre Co.*, 310 S.W.2d 270 (Ky.1958) (addressing the liability of a theatre owner for assaults committed on his premises):

> It is, of course, recognized that a proprietor of a theatre or other place of amusement has the legal duty to use reasonable care to protect his patrons from harm; and if he knows of activities or conduct of other patrons or third persons which would lead a reasonably prudent person to believe or anticipate

that injury to a patron might be caused, it is the proprietor's duty to stop such conduct, if he reasonably can. If he does not, he is liable for resulting injuries.

*Id.* at 271. In *Napper* "[t]he court employed a foreseeability test in examining whether the owner was under a duty to protect a patron from an attack by another patron." *Grisham v. Wal–Mart Stores, Inc.,* 929 F.Supp. 1054, 1057 (E.D.Ky. 1995). Substantial evidence was presented that McDonald's knew of the dangerous pattern of this hoax caller and that the incidents resulting from these calls would continue. Therefore, McDonald's can be held liable for the foreseeable tortious acts committed against Ogborn by its own employees, by Nix, and by the caller.

### F. Ogborn's Negligence Claim Does Not Fail As A Matter Of Law

■ McDonald's claims Kentucky has yet to recognize causes of action for negligent failure to warn, train, or supervise its employees as asserted by Ogborn.[11] Therefore, McDonald's argues, Ogborn could not recover on those theories. However, McDonald's underlying premise is in error.

The Sixth Circuit Court of Appeals concisely addressed the issue when it said,

Kentucky law recognizes that an employer can be held liable for the negligent supervision of its employees. *See Smith v. Isaacs,* 777 S.W.2d 912 (Ky. 1989). In recognizing the tort of negligent supervision, Kentucky has adopted the Restatement (Second) of Agency § 213 which illustrates the requirements for establishing a claim of negligent supervision. *Id.* at 914. As the commentary and illustrations following the Restatement clarify, an employer may be held liable for negligent supervision only if he or she knew or had reason to know of the risk that the employment created. *See* Restatement (Second) of Agency § 213 (1958) (Comment & Illustrations).

*Booker v. GTE.net LLC,* 350 F.3d 515, 517 (6th Cir.2003) (interpreting Kentucky law). Additionally, we find reference to the tort of negligent training or negligent supervision in several other opinions of our appellate courts. *See, e.g., Rowan County v. Sloas,* 201 S.W.3d 469, 477 (Ky.2006) (implicitly recognizing viability of cause of action for "negligent supervision and/or insufficient or improper training of staff" but basing decision on immunity defense); *Franklin County, Ky. v. Malone,* 957 S.W.2d 195, 202 (Ky.1997) (implicitly recognizing viability of claim that government employer "negligently failed to train and supervise" employee, but basing decision on immunity defense), *overruled on other grounds by Commonwealth v. Harris,* 59 S.W.3d 896 (Ky.2001), *and Yanero v. Davis,* 65 S.W.3d 510, 161 Ed. Law Rep. 1058 (Ky.2001); *Zimmerman v. Miller's Bottled Gas, Inc.,* 775 S.W.2d 934, 936 (Ky.App.1989) (considering the possibility that the employer "was negligent in failing to train [employee]").

■ In Ogborn's case, the evidence clearly allowed the jury to find that McDonald's knew or had reason to know there was a risk that the hoax caller would call another of its restaurants; this was a risk to Ogborn's employment which McDonald's created.[12] The jury found, and

---

11. McDonald's sole authority for this proposition is an opinion of this Court that was ordered depublished by the Kentucky Supreme Court. Because there is published authority directly addressing this issue, CR 76.28(4)(c) does not authorize its citation.

12. This risk of nonemployment-related danger, unforeseeable by Ogborn, is not the equivalent of and should not be confused with any risk associated with pursuit of the employer's interest. *See infra,* Section III.A.

we cannot disagree, that but for McDonald's failure to satisfy its duty to supervise or train its employees regarding this particular risk of which it was aware, Ogborn would not have been injured.

For these reasons, Ogborn was not precluded from asserting a claim for negligence directly against McDonald's.

### G. Nix's Criminal Acts Do Not Prevent McDonald's Liability

 McDonald's next argues that Nix's criminal actions were an intervening and superseding cause that prevents imposition of liability to them. However, "we reject any all-inclusive general rule that, as [McDonald's] contends, 'criminal acts of third parties ... relieve the original negligent party from liability.'" *Britton v. Wooten,* 817 S.W.2d 443, 449 (Ky.1991). Nix's actions mirror similar assaults resulting from the efforts of this hoax caller against other McDonalds stores. Evidence was presented that McDonalds knew about these calls, that some resulted in criminal activity, and that all or most resulted in injury. Nix's criminal activity was a foreseeable danger, one naturally resulting from McDonalds decision not to warn, train, or supervise its managers and owners that these hoax calls were an ongoing problem.

 "A superseding cause is a factor of such extraordinary, unforeseeable nature as to relieve the original wrongdoer of liability to the ultimate victim." *Briscoe v. Amazing Products, Inc.,* 23 S.W.3d 228, 229 (Ky.App.2000), citing *Montgomery Elevator Co. v. McCullough,* 676 S.W.2d 776 (Ky.1984). Nixs conduct does not prevent McDonalds "from being liable for harm to [Ogborn] which [its] antecedent negligence is a substantial factor in bringing about." *Briscoe* at 229, citing Restatement (Second) of Torts 440 (1965); *Donegan v. Denney,* 457 S.W.2d 953, 958 (Ky. 1970).

### H. Evidence Supports Award of Punitive Damages Under KRS 411.184(3)

 Punitive damages were awarded against McDonald's in favor of Ogborn because of the acts of Summers and/or Dockery. KRS 411.184(3) states that "[i]n no case shall punitive damages be assessed against a principal or employer for the act of an agent or employee unless such principal or employer authorized or ratified or should have anticipated the conduct in question." The trial court instructed the jury not to award punitive damages against McDonald's on the basis of Summers' and Dockery's actions unless McDonald's "authorized or ratified or should have anticipated their conduct." Clearly, the instruction properly limited the jury's consideration of the evidence to that contemplated by the statute.

McDonald's further argues that the jury awarded punitive damages "not for McDonald's conduct but for the conduct of the Caller, Nix, Dockery, and Summers." That argument is contradicted by Instruction No. 9 which states, in pertinent part,

If you find for Louise Ogborn and award her compensatory damages under any previous instruction, and if you are further satisfied by clear and convincing evidence that McDonald's Corporation, in failing to comply with *its* duties, acted in reckless disregard for the safety, security and well-being of others, including Louise Ogborn, you may in your discretion award punitive damages against McDonald's corporation.... (emphasis supplied)

It is obvious from the record that the jury believed McDonald's owed a duty to train, supervise, or warn about these hoax calls, that it failed in that duty, and that the failure was the result of a reckless disregard for Ogborn's safety, security and

well-being. The evidence justifies that conclusion.

 Still, McDonald's argues that it could not have anticipated Summers' and Dockery's conduct in response to the hoax, and certainly not the conduct of Nix. During the course of a four-week trial, McDonald's presented evidence supporting that position, and Ogborn and Summers presented substantial evidence to the contrary. It was for the jury to decide that issue. "In such case, this Court will not usurp the prerogative of the jury to believe a witness or set of witnesses, as opposed to another set of witnesses, and will not disturb the jury's verdict." *Rojo, Inc. v. Drifmeyer,* 357 S.W.2d 33, 35 (Ky. 1962) (citations omitted).

The punitive damages award to Ogborn did not violate KRS 411.184.

### IV. *Arguments Pertaining Only to Summers*

With regard to Summers, the cross-complainant, McDonald's alleges the following:

A. Summers' cross-complaint fails to sufficiently allege IIED; and

B. The trial court erred in not granting McDonald's motion for a directed verdict regarding the IIED claim.

### A. *Summers Properly Pleaded A Cause of Action for IIED*

 McDonald's failed to preserve this issue. To paraphrase our Supreme Court,

If [McDonald's] wished to challenge the sufficiency of the Complaint, [McDonald's] was required to proceed by *Motion to Dismiss for Failure to State a Claim* under CR 12.02(f). If [McDonald's] considered that the claim as stated was "so vague or ambiguous" that [they] could not reasonably respond,

[they] should have filed a *Motion for More Definite Statement* under CR 12.05. [McDonald's] has done neither. *Natural Resources and Environmental Protection Cabinet v. Williams,* 768 S.W.2d 47, 51 (Ky.1989)(emphasis in original). Just as significantly, McDonald's acknowledged in several pleadings, and during certain hearings, that Summers was pursuing an IIED claim. Furthermore, McDonald's own proposed jury instruction specifically allowed the jury to "compensate Donna Summers for such mental and emotional distress as you determine from the evidence she has suffered directly by reason of McDonald's conduct. . . ."

Nevertheless, we have examined Summers' cross-complaint, keeping in mind that "Kentucky has always followed the notice pleading theory which only requires a short and plain statement of claim demonstrating that relief is warranted[.]" *J.N.R. v. O'Reilly,* 264 S.W.3d 587, 608 (Ky.2008) (Noble, J., dissenting; citation and internal quotation marks omitted). Though Summers did not specifically enumerate the four elements of a cause of action for IIED,[13] we are satisfied that she adequately gave notice of her claim with ample reference to each element.

### B. *Denial of A Directed Verdict on Summers' IIED Claim Was Proper*

 In order to justify presenting an IIED claim to the jury, and thereby denying a directed verdict motion, the trial court was required to conclude, as a matter of law, that the evidence was sufficient to support each of the four elements of that cause of action. The elements are: (1) intentional or reckless conduct; (2) that was outrageous or intolerable and offends against the generally accepted standards of decency and morality; (3) which caused

---

**13.** Those elements are set forth in Section IV.B., *infra.*

emotional distress; and (4) the distress was severe. *Humana of Kentucky, Inc. v. Seitz,* 796 S.W.2d 1, 2–3 (Ky.1990). The standard by which we review the trial court's decision on this question is well known.

> In reviewing a trial court's denial of a motion for directed verdict, all *"evidence which favors the prevailing party must be taken as true and the reviewing court is not at liberty to determine credibility or the weight which should be given to the evidence."* *Humana of Kentucky, Inc., v. McKee,* 834 S.W.2d 711, 718 (Ky. App.1992) (emphasis in original). Moreover, the *"prevailing party is entitled to all reasonable inferences which may be drawn* from the evidence." *Id.* (emphasis in original).

*Ten Broeck Dupont, Inc. v. Brooks,* 283 S.W.3d 705, 735 (Ky.2009).

█ In the case before us, there was evidence that McDonald's was aware the hoax caller had targeted many of its stores during the ten years prior to his call to the Mt. Washington McDonald's; many of his calls were successful and some produced results similar to what occurred here. There was also evidence that McDonald's intentionally withheld information from those stores not yet targeted by the caller which would have been helpful in avoiding similar incidents.

Embedded in the elements of an IIED cause of action is a duty to refrain from intentional and reckless conduct. While acts of commission more commonly serve to support the IIED claim, acts of omission have been held sufficient. *Capital Holding Corp. v. Bailey,* 873 S.W.2d 187, 196 (Ky.1994) (failure to warn worker that pipes he would work on were asbestos insulated). With acts of commission, the duty is to refrain from certain conduct; with acts of omission, there must be a duty to act that was not met. Here, the duty

was to inform or warn Summers by training or supervision. The jury, under a different instruction, found that McDonald's failed in that duty. *Capital Holding* again provides guidance. In that case, the Court determined that the record supported the conclusion that

> the appellee was under a duty to warn Mr. Bailey of the presence of asbestos. At the same time, as the record stands, it could be inferred that the appellee intentionally failed to do so. It, likewise, could be inferred that the appellee should have realized that there was a high probability that severe emotional distress would follow from Mr. Bailey's unwitting exposure to such a dangerous substance as asbestos. We cannot say as a matter of law that if the appellee, with full knowledge of the danger, intentionally failed to warn Mr. Bailey or his employer [his wife] of the presence of the asbestos, this would not constitute outrageous conduct. The known effects of exposure to this substance are such that we regard it as "utterly intolerable in a civilized community," *Restatement (Second) of Torts* § 46, comment d at p. 73 (1965), that one having a duty to warn of its presence would deliberately fail to do so.

*Id.* at 196. Similarly, in this case, there was evidence that McDonald's intentionally failed to inform its managers about these hoaxes in order to protect its image. It can likewise be said that McDonald's, through its corporate officers, was aware of the emotional damage that its other managers and supervisors experienced upon learning that they were a pawn to this hoax caller and that uninformed managers and supervisors subsequently taken in by this hoax would suffer the same damage. There was also sufficient evidence to support Summers' allegation that McDonald's failure to warn in this case

caused her severe emotional distress. To reverse the judgment, we would have to rule as a matter of law that these facts do not matter; we would have to say McDonald's intentional failure to warn its employees about these phone calls would not qualify as outrageous conduct. This we cannot do.

We can reach but one conclusion—the jury's verdict was not so flagrantly against the weight of the evidence as to indicate passion or prejudice; the trial court's decision to deny the motion for directed verdict therefore must be affirmed. *Consolidated Infrastructure Mgmt. Auth., Inc. v. Allen*, 269 S.W.3d 852, 856 (Ky.2008) ("trial court's ruling [denying directed verdict] will be overturned only where the jury's verdict is so flagrantly against the weight of the evidence as to indicate passion or prejudice").

## V. *Arguments Pertaining Both to Ogborn and to Summers*

With regard both to Ogborn and to Summers, McDonald's makes the following arguments:

A. That the amounts awarded in compensatory damages should have been apportioned by 50 percent to the unknown caller;

B. That the amounts of punitive damages awarded do not comport with due process as they are unconstitutionally excessive.

## A. *Judgment Properly Apportioned Liability to McDonald's*

McDonald's argues that the judgment must be reversed because it fails to follow the jury's verdict apportioning only 50 per-

cent of the fault to McDonald's. Therefore, McDonald's argues, it should be liable for only 50 percent of all compensatory and punitive damages. We disagree.

The jury was presented with an apportionment instruction in both Ogborn's case and Summers' case against McDonald's.[14] The apportionment instructions are identical, in pertinent part, and to that extent state as follows:

> If you have found for [Ogborn or Summers, respectively] against one or more *of the parties,* you shall apportion your verdict by deciding what percentage of the total fault was attributable to each, your total percentage to equal 100% .... [Y]ou shall consider both the nature of the conduct *of the parties* and the extent of the causal relationship between their conduct and the damages sustained. (emphasis supplied)

The emphasized language in these instructions comports with KRS 411.182(1), the apportionment statute, in that it contemplates apportionment only among "part[ies] to the action, including third-party defendants and persons who have been released[.]" KRS 411.182(1).

However, the verdict forms corresponding to these instructions did not comply with KRS 411.182(1); the verdict form allowed allocation of fault to "the Caller(s)," a non-settling non-party.[15] If the *judgment* drawn from those verdict forms actually had reflected an apportionment to a non-settling non-party, and assuming the error would have been preserved, we would have been compelled to reverse. *See, e.g., Jones v. Stern,* 168 S.W.3d 419 (Ky.App.2005); *Copass v. Monroe County*

14. Instruction No. 8 in Ogborn's case and Instruction No. 3 in Summers' case.

15. As noted, *supra,* McDonald's originally believed David Stewart was the caller. After he

was acquitted, reference in the civil action, including in the instructions, was not to Stewart but to another, unidentified caller, who was never made a party to the action.

*Med. Found., Inc.,* 900 S.W.2d 617 (Ky. App.1995); *and Baker v. Webb,* 883 S.W.2d 898 (Ky.App.1994). Fortunately, the trial court's judgment stated:

> *In the case of Louise Ogborn v. Mc-Donald's Corporation* ... there shall be no allocation of fault under the sexual harassment count (Verdict Form 6) nor under the premises liability count (Verdict Form 3) and the Plaintiff Louise Ogborn shall be entitled to a full award of the compensatory damages without allocation.

> *In the case of Donna Summers v. Mc-Donald's Corporation* ... there shall be no allocation of fault under the Intentional Infliction of Emotional Distress count (Verdict Form 1) and the Cross–Claimant Donna Summers shall be entitled to a full award of the compensatory damages without allocation.

(Judgment entered November 15, 2007; emphasis in original). There are three reasons it was appropriate for the trial court to correct the potential error created by the erroneous verdict forms.

First, the instructions must be read as a whole. *Bills v. Commonwealth,* 851 S.W.2d 466, 471 (Ky.1993). Ogborn's Instruction No. 8 and Summers' Instruction No. 3 allowed allocation *only* to parties. The errant corresponding verdict forms should not have included "the Caller(s)" because the caller was not a party. In the final analysis, the only *party* to which the jury allocated any fault was McDonald's.[16]

Second, even if the unidentified caller had been a party, the verdict forms still would have been improper. "Fault may not be properly allocated to a party, a dismissed party or settling non-party unless the court or the jury first finds that the party was at fault; otherwise, the party has no fault to allocate." *Owens Corning Fiberglas Corp. v. Parrish,* 58 S.W.3d 467, 471 n. 5 (Ky.2001). The jury never found the unknown caller was at fault because the instructions only provided for the possibility that McDonald's, Summers, Dockery or Ogborn were at fault. Consequently, no degree of fault could properly be allocated to the unidentified caller.

Third, Ogborn prevailed on causes of action for which fault could only be attributable, based on this record, directly or vicariously to McDonald's (negligent failure to supervise or train; premises liability; false imprisonment;[17] sexual harassment). The same can be said of the only cause of action on which Summers prevailed—intentional infliction of emotional distress for failing to train or warn of the hoax.

McDonald's cited numerous cases in support of its argument regarding apportioning liability to the unknown caller. However, every case cited involved apportioned liability to a party or a settling non-party. The error of allowing apportionment to a non-settling non-party was fully

---

16. McDonald's could have joined the unknown party as a third-party defendant, CR 4.15, and constructively served that party pursuant to CR 4.05, CR 4.06, and CR 4.07. As a party to the action, the unknown defendant could be apportioned liability. *See Kentucky Farm Bureau Mut. Ins. Co. v. Ryan,* 177 S.W.3d 797, 804 (Ky.2005)(Defendant "properly joined the [unidentified] motorcyclist as a party to the action and presented sufficient evidence to justify an apportionment instruction.").

17. No evidence suggested that the unidentified caller was Ogborn's employer, or an agent or employee of McDonald's, nor was he the owner of the premises. In theory, the caller might have contributed to Ogborn's false imprisonment, but our examination of the voluminous record revealed that Summers alone told Ogborn she was speaking with the local police.

corrected by the judgment in this case, and we cannot disturb that judgment on this ground.

McDonald's also claims a note from the jury foreperson to the trial judge expresses the jury's intention that McDonald's be responsible for paying only 50 percent of the total damages awarded. The note states:

V 8 [Verdict Form No. 8] who pays or fault we understood yesterday that the allocation of fault was money paid.

 It would be improper to give any weight to this note. All that can be said of the note is that it: (1) represented the jury's temporary perception that may or may not have changed before the verdict was rendered; (2) went appropriately unanswered; and (3) related to a verdict form we determined was technically erroneous, but was actually favorable to McDonald's.[18] Notwithstanding the existence and attributes of the note, a jury speaks only through its verdict. As Professor Wigmore stated:

The jurors' deliberations during retirement, their expressions, arguments, motives and beliefs represent that state of mind which must precede every legal act and is in itself of no jural consequence. The verdict as finally agreed upon and pronounced in court by the jurors must be taken as the sole embodiment of the jury's act. Hence it stands irrespective of what led up to it in the privacy of the jury room, precisely as the prior negotiations of the parties to a contract disappear from legal consideration when once the final agreement is reduced to writing and signed.

8 Wigmore on Evidence § 2348 (John T. McNaughton ed., 1961) (internal citation and emphasis omitted). To paraphrase Professor Wigmore, as an expression of "that [jury's] state of mind which must precede every [verdict, the jury's note to the judge in this case is] of no jural consequence."

Our decision regarding apportionment applies equally to the compensatory and punitive damages awarded in both cases. However, there is an additional reason why apportionment was not appropriate with regard to the punitive damages awarded. The punitive damages instructions in both Ogborn's and Summers' cases (Instruction No. 9 and Instruction No. 4, respectively) specifically state, "This instruction is only against McDonald's Corporation." With the exception of this sentence, the punitive damages instruction tendered by McDonald's is virtually identical to that presented to the jury. Both the tendered instruction and that submitted to the jury provided for punitive damages to be awarded only against McDonald's and no other party. McDonald's did not object to the trial court's addition of the clarifying sentence, and we see no error in limiting the award of punitive damages to McDonald's.

### B. Punitive Damages Awards—Generally

McDonald's argues the amount of punitive damages awarded is unconstitutionally excessive. With regard to the award of punitive damages against McDonald's in favor of Ogborn, we disagree. However, we agree that the punitive damages awarded to Summers are unconstitutionally excessive.

18. This is an additional reason it was appropriate for the trial court to correct the erroneous verdict form. "[T]echnically incorrect instructions are not grounds for reversal where the rights of the losing party are not prejudiced." *Miller v. Miller,* 296 S.W.2d 684, 687 (Ky.1956).

 The standard of review of the constitutionality of punitive damages is *de novo*. *Steel Technologies, Inc. v. Congleton*, 234 S.W.3d 920, 931 (Ky.2007), citing *Cooper Industries, Inc. v. Leatherman Tool Group, Inc.*, 532 U.S. 424, 436, 121 S.Ct. 1678, 1685–86, 149 L.Ed.2d 674 (2001). This review is guided primarily by *BMW of North America, Inc. v. Gore*, 517 U.S. 559, 116 S.Ct. 1589, 134 L.Ed.2d 809 (1996), and its progeny.[19]

 *Gore* tells us, "[s]tates necessarily have considerable flexibility in determining the level of punitive damages that they will allow in different classes of cases and in any particular case." *Gore*, 517 U.S. at 568, 116 S.Ct. at 1595. The purpose behind any award of punitive damages is "to further a State's legitimate interests in punishing unlawful conduct and deterring its repetition."[20] *Id.; see Kentucky Farm Bureau Mut. Ins. Co. v. Rodgers*, 179 S.W.3d 815, 826 (Ky.2005). "Only when an award can fairly be categorized as 'grossly excessive' in relation to these interests does it enter the zone of arbitrariness that violates the Due Process Clause of the Fourteenth Amendment." *Gore*, 517 U.S. at 568, 116 S.Ct. at 1595, citing *TXO Production Corp. v. Alliance Resources Corp.*, 509 U.S. 443, 456, 113 S.Ct. 2711, 2719, 125 L.Ed.2d 366 (1993). The difficult question is, of course, "What constitutes a 'grossly excessive' award?"

Helping to answer this question, the Supreme Court offered three "guideposts," instructing courts "to consider (1) the degree of reprehensibility of the defendant's misconduct, (2) the disparity between the actual or potential harm suffered by the plaintiff and the punitive damages award, and (3) the difference between the punitive damages awarded by the jury and the civil penalties authorized or imposed in comparable cases." *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. at 409, 123 S.Ct. at 1515, citing *Gore*, 517 U.S. at 575, 116 S.Ct. 1589. We consider the reasonableness of each of these punitive damages awards in the context of the three guideposts.

### 1. Degree of reprehensibility

 "[T]he most important indicium of the reasonableness of a punitive damages award is the degree of reprehensibility of the defendant's conduct." *Gore*, 517 U.S. at 575, 116 S.Ct. at 1599. "This principle reflects the accepted view that some wrongs are more blameworthy than others." *Id.* The Supreme Court stated that behaviors marked by violence, the threat of violence, trickery, or deceit were more reprehensible than those behaviors that did not exhibit these markers. *Id.* at 576, 116 S.Ct. at 1599. Furthermore, "[A] recidivist may be punished more severely than a first offender [because] repeated misconduct is more reprehensible than an individual instance of malfeasance." *Id.* at 577, 116 S.Ct. at 1599–1600, citing *Gryger v. Burke*, 334 U.S. 728, 732, 68 S.Ct. 1256, 1258–1259, 92 L.Ed. 1683 (1948) (explaining that though defendant in *Gore* was not a recidivist, a pattern of misconduct should be considered as adding to the reprehensibility of a tortfeasor's conduct).

**19.** In particular, we are referring here to *Cooper Industries, supra*, and *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 123 S.Ct. 1513, 155 L.Ed.2d 585 (2003).

**20.** Additionally, because it is only one state's interest that comes into play, the jury must be instructed that it may not use evidence of out-of-state conduct to punish a defendant for action that was lawful in the jurisdiction where it occurred. *Sand Hill Energy, Inc. v. Smith*, 142 S.W.3d 153, 156 (Ky.2004), citing *Campbell*, 538 U.S. at 422–23, 123 S.Ct. 1513. In the case *sub judice*, the jury was effectively so instructed.

 As is too often true, applying these concepts to a specific fact pattern produces an imperfect fit. In isolation, McDonald's mere failure to provide its managers with information may not appear to constitute "behavior[ ] marked by violence, the threat of violence, trickery or deceit." But McDonald's personnel were trained to cooperate with police authority. They were not told there was a caveat to that training—the widespread perpetration of a hoax by a caller pretending to be police authority. The Mt. Washington McDonald's restaurant employees were made vulnerable to "violence, the threat of violence, trickery or deceit" by McDonald's decision to refrain from training or providing information about the hoax caller. We believe the jury found such behavior reprehensible because the evidence supports a conclusion that McDonald's consciously placed a higher value on corporate reputation than on the safety of its own employees. And while McDonald's cannot be accurately called a recidivist, the evidence demonstrated that over a ten-year period McDonald's repeatedly made this choice.

While Ogborn and Summers were made equally vulnerable by McDonald's conduct, they were not equally affected by it. In determining reprehensibility, we must also consider the separate impact of McDonald's conduct on the two employees.

Summers experienced extreme emotional distress upon learning she had been duped into serving as an unwitting accomplice to the hoax, but she was not exposed to physical violence, threat of violence, or restraint. In Ogborn's case, however, "the proofs show that threats, violence, and imprisonment, were accompanied by mental fear, torture, and agony of mind." *Gore,* 517 U.S. at 576 fn. 24, 116 S.Ct. at 1599, quoting *Blanchard v. Morris,* 15 Ill. 35, 36 (1853). Reprehensibility exists in both cases; however, we cannot escape the fact

that, in degree, the reprehensibility is clearly greater in Ogborn's case.

### 2. *Disparity between actual or potential harm and punitive damages award*

In *Gore,* the Supreme Court simply calls the second guidepost *"Ratio"* and notes that it is the "most commonly cited indicium of an unreasonable or excessive punitive damages award[.]" *Gore,* 517 U.S. at 580, 116 S.Ct. at 1601. Since *Gore,* guidance about "ratio" has been intentionally somewhat nonspecific.

Citing *Campbell, supra,* the Supreme Court recently said, "the longstanding historical practice of setting punitive damages at two, three, or four times the size of compensatory damages, while 'not binding,' is 'instructive,' and that '[s]ingle-digit multipliers are more likely to comport with due process.'" *Philip Morris USA v. Williams,* 549 U.S. 346, 351, 127 S.Ct. 1057, 1061–62, 166 L.Ed.2d 940 (2007), citing *Campbell,* 538 U.S. at 425, 123 S.Ct. 1513. Even more recently, the Court, again citing *Campbell,* said,

> Although "we have consistently rejected the notion that the constitutional line is marked by a simple mathematical formula," [*Gore,* 517 U.S.] at 582, 116 S.Ct. 1589, we have determined that "few awards exceeding a single-digit ratio between punitive and compensatory damages, to a significant degree, will satisfy due process," *State Farm [v. Campbell ],* 538 U.S. at 425, 123 S.Ct. 1513[.]

*Exxon Shipping Co. v. Baker,* —— U.S. ——, ——, 128 S.Ct. 2605, 2626, 171 L.Ed.2d 570 (2008).

The Supreme Court in *Exxon,* addressing the "audible criticism in recent decades" that discretion to award punitive damages has "mass-produced runaway awards" said,

although some studies show the dollar amounts of punitive-damages awards growing over time, even in real terms, by most accounts the median ratio of punitive to compensatory awards has remained less than 1:1.

*Exxon*, 128 S.Ct. at 2624.[21] These studies should tell us that even when we factor in punitive awards of double, treble and quadruple the compensatory award, it is wisdom and common sense that, to quote the Supreme Court, "will cabin the jury's discretionary authority," at least in most cases. *Philip Morris (USA)*, 549 U.S. at 352, 127 S.Ct. at 1062. In other words, if all punitive damages awards were plotted on a graph, the resulting bell curve would show the median ratio of 1:1 at the curve's apex; only the awards at the extremities of the curve would be deemed constitutionally improper solely as a consequence of their deviation from this median ratio.

The ratio of punitive damages to compensatory damages in Ogborn's case is approximately 4.5:1. In *Pacific Mut. Life Ins. Co. v. Haslip*, 499 U.S. 1, 111 S.Ct. 1032, 113 L.Ed.2d 1 (1991), the Court assessed a 4.2:1 ratio, and "even though a punitive damages award of 'more than 4 times the amount of compensatory damages' might be 'close to the line,' it did not 'cross the line into the area of constitutional impropriety.'" *Gore*, 517 U.S. at 581, 116 S.Ct. at 1602, citing *Haslip*, 499 U.S. at 23–24, 111 S.Ct. at 1046.

On the other hand, the ratio in Summers' case is 10:1. The question becomes, is Summers' award one of those "few awards exceeding a single-digit ratio [that] will satisfy due process"? *Campbell*, 538 U.S. at 425, 123 S.Ct. at 1524.

Summers argues that "low awards of compensatory damages may properly support a higher ratio than high compensatory awards[.]" *Gore*, 517 U.S. at 582, 116 S.Ct. at 1602. While Ogborn recovered more than $1 million in compensatory damages, Summers recovered only $100,000. Although Summers' compensatory damages award is less than one-tenth the amount recovered by Ogborn, that award is not "low" as that term is used in the passage quoted from *Gore*.

*Gore* referred to low awards as those that "resulted in only a *small* amount of economic damages." *Id.* (emphasis supplied). In *Exxon*, the Court made it clear that it was referring to *nominal* damages. Citing *Gore* for this principle, *Exxon* supplements that citation with another to the Restatement (Second) of Torts, stating, "Thus an award of *nominal* damages . . . is enough to support a further award of punitive damages, when a tort . . . is committed for an outrageous purpose, but no significant harm has resulted." *Exxon*, 128 S.Ct. at 2622, quoting Restatement (Second) of Torts § 908, Comment *c*, p. 465 (emphasis supplied).

Summers did not recover nominal damages. Therefore, her punitive damages award of ten times her award of compensatory damages is constitutionally suspect.

### 3. *Sanctions for comparable misconduct*

The third guidepost "calls for a broad legal comparison[.]" *Cooper Industries*, *supra*, 532 U.S. at 440, 121 S.Ct. at 1688. It compares the punitive damages awarded and the civil or criminal penalties that could be awarded for similar misconduct. *Gore*, 517 U.S. at 583, 116 S.Ct. at 1603. Once again, the impact of McDonald's mis-

---

**21.** While *Exxon* applied maritime law, the quoted passage was not limited to punitive damages in maritime cases.

conduct upon Ogborn differed markedly from the impact it had on Summers.

McDonald's concealment of information about the hoax calls facilitated all that Ogborn experienced; she was falsely accused of theft, threatened, subjected to a strip-search, and held against her will in a room with several men, one of whom sexually assaulted her. We must consider that both Summers and Nix were convicted of crimes, and Nix is currently serving a sentence on felony sexual assault charges. Considering that criminal convictions resulting in consequential sentences resulted from this case, the punitive damages awarded to Ogborn do not "raise a suspicious judicial eyebrow." *Id.*, quoting *TXO*, 509 U.S. at 481, 113 S.Ct. at 2732 (O'Connor, J., dissenting).

By contrast, Summers' emotional distress was made manifest only when she realized she was not aiding law enforcement but was, instead, facilitating criminal activity. She experienced no violence, imprisonment, or assault. Indeed, a portion of the injury Summers experienced might be fairly attributed to lapses in her own judgment, however psychologically justified. In fact, the jury had already determined that a portion of Ogborn's injuries were attributable to those lapses.

All of Summers' injuries were nonphysical in nature; the award of $100,000 compensated her IIED claim only. The $1,000,000 punitive damages award is extraordinary when compared to other stand-alone IIED cases. For example, in *Burgess v. Taylor*, 44 S.W.3d 806 (Ky.App. 2001), the plaintiff was awarded $50,000 in compensatory damages and $75,000 in punitive damages after the individuals who promised to care for the plaintiff's prized and beloved Appaloosa horses immediately sold them to a slaughterhouse. *Id.* at 809–10. By contrast with the amount awarded to Summers, the punitive damages award

was low both in amount and in its ratio to the compensatory damages. *See also Childers Oil Co., Inc. v. Adkins*, 256 S.W.3d 19 (Ky.2008)($61,922 in compensatory damages, $50,000 in punitive damages; reversed because of improper jury instruction).

We are additionally struck by the disparity between the two punitive damages awards. Though the harm to Ogborn was greater by all measures, the punitive damages award to Ogborn is substantially smaller than that awarded to Summers, measured as a multiple of the compensation for that harm. Summers' award is out of all proportion to the harm she suffered relative to that suffered by Ogborn.

### C. Punitive Damages Awarded to Ogborn Were Proper

Applying the guideposts set out in *Gore*, we hold that the punitive damages awarded to Ogborn are not constitutionally excessive.

### D. Punitive Damages Awarded to Summers Were Constitutionally Excessive

Applying each of the *Gore* guideposts to Summers' punitive damages award shows that the $1,000,000.00 award is constitutionally excessive. The trial court should have granted McDonald's motion to reduce the punitive damages award in favor of Summers so as to comport with constitutional limitations. That task now falls to this Court.

While the United States Supreme Court has declined to "impose a bright-line ratio which a punitive damages award cannot exceed[,]" *Campbell*, 538 U.S. at 425, 123 S.Ct. at 1524, that Court has also said punitive damages exceeding "4 times the amount of compensatory damages' might be 'close to the line[.]' " *Gore*, 517 U.S. at

581, 116 S.Ct. at 1602, citing *Haslip*, 499 U.S. at 23, 111 S.Ct. at 1046. Therefore, we take as our starting point the upper limit of what the Supreme Court has deemed constitutionally acceptable under the second guidepost—a punitive damage award equal to four times the compensatory damages. That would equal $400,000.00 in Summers' case. Next, we reconsider the first and third guideposts.

When the Supreme Court determined that punitive damages awards should be reviewed *de novo*, careful consideration was given to the relative abilities of the fact-finder and the reviewing court to make determinations under each of the three guideposts. *Cooper Industries*, 532 U.S. at 440, 121 S.Ct. at 1687–88. The Court said, "[W]ith respect to the first *Gore* inquiry[, reprehensibility,] the district courts [i.e., the fact-finders] have a somewhat superior vantage over courts of appeals, and even then the advantage exists primarily with respect to issues turning on witness credibility and demeanor." *Id.*

Regarding the reprehensibility of McDonald's actions, we are inclined to refrain from disturbing the jury's implicit determination that McDonald's actions were sufficiently reprehensible to justify a substantial punitive damages award. Therefore, reconsideration of the first guidepost does not result in our further reduction of the punitive damages award.

Unlike the first, "the third *Gore* criterion [sanctions for comparable misconduct], which calls for a broad legal comparison, seems more suited to the expertise of appellate courts." *Id.* Therefore, we allow no deference to the jury's determination. However, we have nothing directly and little indirectly with which to compare Summers' claim. Nothing has been presented on this point for us to consider, and we have no basis upon which to justify a further reduction in Summers' punitive damages award.

Therefore, this Court orders that the punitive damages award in favor of Summers be reduced to the constitutionally acceptable amount of $400,000.00.

The judgment of the Bullitt Circuit Court is affirmed, except as to the punitive damages awarded to Summers, which is reversed, and this case is remanded to the trial court for entry of an amended judgment in accordance with this opinion.

ALL CONCUR.