Fullmer A. MENDEZ, Appellant/Cross–Appellee,

v.

UNIVERSITY OF KENTUCKY BOARD OF TRUSTEES; and Bambang Sutardjo, Appellees/Cross–Appellants.

Nos. 2010–CA–001244–MR, 2010–CA–001311–MR.

Court of Appeals of Kentucky.

Aug. 12, 2011.

Rehearing Denied Sept. 28, 2011.

Discretionary Review Denied by Supreme Court Feb. 15, 2012.

William C. Jacobs (argued), Lexington, KY, for Appellant/Cross–Appellee.

Barbara A. Kriz (argued), Lexington, KY, for Appellees/Cross–Appellants.

Before TAYLOR, Chief Judge; CLAYTON and CAPERTON, Judges.

*OPINION*

CLAYTON, Judge:

Fullmer A. Mendez appeals from the Fayette Circuit Court's trial judgment pursuant to a jury verdict, entered on May 12, 2010, in favor of University of Kentucky Board of Trustees (hereinafter "the Board") and Bambang Sutardjo. This action was filed under Kentucky Revised Statutes (KRS) Chapter 344, the Kentucky Civil Rights Act. Mendez claims that his job termination constituted unlawful religious discrimination. He also appeals the trial court's order, which denied his Kentucky Rules of Civil Procedure (CR) 59.01 motion for a new trial, which was entered on June 15, 2010. In addition, the Board and Sutardjo cross-appeal on the grounds that the trial court erred in failing to grant summary judgment on all issues and erred in instructing the jury. For the reasons which follow, we affirm the decisions of the Fayette Circuit Court.

### FACTUAL AND PROCEDURAL BACKGROUND

Mendez was originally from the Dominican Republic and moved to Lexington, Kentucky, in 1991. In October 2003, Mendez began his employment as a temporary computer technician in the University of Kentucky's College of Health Sciences. He was hired under the University's Student Temporary Employment Program

(hereinafter "STEPS"). At the time of his hiring, he acknowledged that he received a copy of the handbook for the University of Kentucky (hereinafter "UK") and understood his responsibility to read and understand its provisions. The acknowledgement specifically stated that Mendez was considered an "at will" employee and subject to layoff or termination in accordance with University policies and procedures.

Thereafter, in 2005, Sutardjo became Mendez's supervisor at the College of Health Sciences. Sutardjo is originally from Indonesia. He and Mendez knew each other because they had previously worked together for about a year-and-a-half at Kentucky Trade Computers. During that time, they had an excellent working relationship and were friends outside of work.

Shortly after Sutardjo became Mendez's supervisor at the College of Health Sciences, Mendez tendered his resignation claiming that he needed a higher paying position. Sutardjo discouraged Mendez from leaving and was instrumental in Mendez obtaining a raise. After receiving the pay raise, Mendez rescinded his letter of resignation.

The precipitating event leading up to the cessation of Mendez's employment at the College of Health Sciences occurred on March 27, 2006. One morning he was assigned to work on the computer of Dr. Susan Effgen, a professor at the College. She had experienced repeated problems with her computer. After looking at the computer, Mendez decided that he could not fix it until the next day. He informed her and went to lunch. When he returned from lunch, Sutardjo, as his supervisor, asked about the repair of the computer. After Mendez told him that the computer would not be fixed until the next day, Sutardjo told him to finish the work on the computer now because Mendez did not

have the authority to determine turn-around time. Mendez replied that he was not trying to create new policy. Then, Sutardjo said he did not want Mendez to work in the department any longer.

But Mendez proffers a different reason for his dismissal. He maintains that the reason for his termination was not based on his failure to work on Effgen's computer in a timely fashion, but rather, his termination resulted from a disagreement with Sutardjo, which Mendez believes was the cause of his termination. The parties' religious backgrounds are as follows: Mendez was born and raised Catholic, and Sutardjo was a member of the Islamic religion. Mendez knew Sutardjo's religion because at one time he had been invited to Sutardjo's home for dinner at the conclusion of Ramadan. Sutardjo intimated that while he was not sure of Mendez's religious beliefs, he thought that he was Christian or Catholic.

According to Mendez's testimony, although he does not cite to the record in providing these details, a few weeks before his assignment ended, Sutardjo and Dr. Maria Boosalis, the Director of the Department of Clinical Nutrition, were having a discussion concerning the publication of cartoons about the prophet Mohammed in the Danish press, and the protests in Europe that occurred after the publication of the cartoons. Mendez claims that Sutardjo asked his opinion about it. Mendez says that he responded that the Danish press was free to publish what they wished. Mendez then describes Sutardjo as being upset during the conversation, but he acknowledged that no mention of either party's religion was made, nor did either party attack the other during the conversation. After the discussion, again without citation to the record, Mendez stated that the relationship between them soured, and their interactions were only

about business. Yet, Sutardjo did not increase Mendez's workload, although he required Mendez to complete his work assignments within a strict time period. Mendez, however, did not find the requirement to be unreasonable.

Hence, Mendez's employment ended in April 2006. Following his termination from his temporary assignment at the College of Health Sciences, Mendez did not go to UK's Human Resources Department to inquire about reassignment. STEPS protocol is for an employee, upon completion of a temporary assignment, to return for reassignment. Therefore, Mendez was considered to have voluntarily left. In fact, Sutardjo's evaluation of Mendez indicated that Mendez's assignment was complete and that Sutardjo would recommend Mendez for other assignments. In July 2006, Mendez applied for another position at the University. When he was a finalist for the position, the University could not reach him. Apparently, at that time, Mendez's mother was ill, and he was in the Dominican Republic caring for her until January 2007.

On September 17, 2007, Mendez filed a complaint in Fayette County, which alleged religious discrimination in violation of KRS 344.040 and wrongful discharge based on the violation of public policy found in Kentucky Constitution (Ky. Const.) §§ 1, 5, and 8. On June 1, 2009, the Board and Sutardjo filed a motion for summary judgment, which the trial court denied. On April 16, 2010, the Board and Sutardjo filed a renewed motion for summary judgment and asked for the court's reasoning as to its denial of the original motion. On April 28, 2010, the trial court issued another order granting the summary judgment motion as to the Board of Trustees on the wrongful discharge claims, but denied the motion as it related to religious discrimination. The case proceeded to trial on April 26 and 27, 2010, and culminated in a jury verdict for Sutardjo.

Mendez filed a motion for a new trial, alleging the jury instructions were improper. The trial court denied the motion. Mendez now appeals the judgment and jury verdict as well as the order denying his motion for a new trial. In addition, the Board and Sutardjo cross-appeal from the judgment and jury verdict.

## ISSUES

In his appeal, Mendez asserts that the trial court erred when it provided incorrect jury instructions, failed to instruct the jury that he was entitled to lost future wages, and granted the Board and Sutardjo's summary judgment on the wrongful discharge claims. The Board and Sutardjo counter that the jury verdict should be affirmed but, if not, the trial court erred when it denied the summary judgment motion on the religious discrimination claim and erred in its jury instructions. We begin our analysis with the standard of review for erroneous jury instructions.

## STANDARD OF REVIEW

Because alleged errors regarding jury instructions are considered questions of law, we examine them under a de novo standard of review. *Reece v. Dixie Warehouse and Cartage Co.*, 188 S.W.3d 440, 449 (Ky.App.2006). Additionally, "[i]nstructions must be based upon the evidence and they must properly and intelligibly state the law." *Howard v. Com.*, 618 S.W.2d 177, 178 (Ky.1981). The instructions are reviewed "as a whole to determine whether they adequately inform the jury of relevant considerations and provide a basis in law for the jury to reach its decision." *Gibson v. City of Louisville*, 336 F.3d 511, 512 (6th Cir.2003), quoting

*Vance v. Spencer County Public Sch. Dist.*, 231 F.3d 253, 263 (6th Cir.2000).

■ Guidance concerning appellate review of jury instructions has also been provided by the Kentucky Supreme Court:

The rule is that generally an erroneous instruction is presumed to be prejudicial to appellant, and the burden is upon appellee to show affirmatively from the record that no prejudice resulted; and when the appellate court cannot determine from the record that the verdict was not influenced by the erroneous instruction, the judgment will be reversed.

*Drury v. Spalding*, 812 S.W.2d 713, 717 (Ky.1991), quoting *Prichard v. Kitchen*, 242 S.W.2d 988, 992 (Ky.1951). Clearly, the purpose of jury instructions is to give direction to the jury in their deliberations so that the members are able to arrive at a correct verdict. Thus, "[i]f the statements of law contained in the instructions are substantially correct, they will not be condemned as prejudicial unless they are calculated to mislead the jury." *Ballback's Adm'r v. Boland–Maloney Lumber Co.*, 306 Ky. 647, 652–53, 208 S.W.2d 940, 943 (Ky.1948). With this standard in mind, we turn to the issues of the case.

## I. Jury Instructions

The first error alleged by Mendez is that the trial court erred in instructing the jury. To begin, we observe that Mendez brings this action under KRS Chapter 344, the Kentucky Civil Rights Act. The pertinent portions of the statute are as follows:

(1) It is an unlawful practice for an employer:

(a) To fail or refuse to hire, or to discharge any individual, or otherwise to discriminate against an individual with respect to compensation, terms, conditions, or privileges of employment, because of the individual's ... religion....

(b) To limit, segregate, or classify employees in any way which would deprive or tend to deprive an individual of employment opportunities or otherwise adversely affect status as an employee, because of the individual's ... religion....

KRS 344.040(1).

■ Unquestionably, the Kentucky Civil Rights Act "KRS 344.040 prohibits religious discrimination by employers." *Irvin v. Aubrey*, 92 S.W.3d 87, 89 (Ky.App.2001), And, as noted in *Irvin*, under Kentucky jurisprudence the necessary elements to establish a prima facie case of religious discrimination were set forth in *Kentucky Comm'n on Human Rights v. Lesco Mfg. & Design Co., Inc.*, 736 S.W.2d 361 (Ky. App.1987). Therein, the court held that, "one must prove that (1) he has a bona fide belief that compliance with an employment requirement is contrary to his religious faith; (2) he informed his employer about the conflict; and (3) he was discharged because of his refusal to comply with the employment requirement." *Id.* at 363. Further, after a prima facie case has been established by the employee, the employer must then prove that an accommodation to the employee's beliefs and practices will result in an undue hardship on the conduct of the employer's business. *Id.* at 364.

The case at hand does not fit exactly under this paradigm, but Mendez alleges that he was subjected to religious discrimination by Sutardjo and, hence, his employer. He has given no information that compliance with his religion conflicted with any employment requirement or that he informed his employer concerning the conflict. And, since Mendez asked for no accommodations, that factor, too, has not been implicated here. Finally, while it is true that Mendez was discharged from his temporary position, nothing about this discharge has been shown to relate to the

requirements of his job or, in fact, have any relationship to religion at all. In fact, Mendez's proof of discrimination is merely his claim that his discharge was related to a discussion with Sutardjo about Danish cartoons depicting the prophet Mohammed.

Notwithstanding Mendez's apparent failure to establish a prima facie case of religious discrimination, he maintains that this cause of action relies on a "mixed-motive" analysis. The "mixed-motive" theory is primarily based on the federal law found in 42 U.S.C. § 2000e–2(m), which states:

> (m) Impermissible consideration of race, color, religion, sex, or national origin in employment practices[:]Except as otherwise provided in this subchapter, an unlawful employment practice is established when the complaining party demonstrates that race, color, religion, sex, or national origin was a motivating factor for any employment practice, even though other factors also motivated the practice.

The plain meaning of this section of Title VII, as it impacts Mendez, is to allow him to demonstrate that the Board and Sutardjo engaged in an unlawful employment practice and that religion was a motivating factor for it, even though other factors might have supported the adverse employment practice.

■■ To clarify, under federal law, a mixed-motive case is one where both unlawful and lawful reasons affected the employment decision. *Wright v. Murray Guard, Inc.,* 455 F.3d 702, 711 (6th Cir. 2006). Similarly stated, in Title VII cases the mixed-motive approach applies when a plaintiff contends that an adverse employment decision was made for both legitimate and discriminatory reasons. In other words, the mixed-motive analysis permits a finding of liability where the employer is motivated by both unlawful

considerations and legitimate reasons. *Desert Palace, Inc. v. Costa,* 539 U.S. 90, 123 S.Ct. 2148, 156 L.Ed.2d 84 (2003).

■ Here, for several reasons which shall be elucidated, Mendez did not establish that the jury instructions used by the court in this case of alleged "mixed-motive" analysis were not representative of the law and, thus, incorrect. Initially, at no time in the complaint does Mendez ascribe the cause of action in his religious discrimination case as based on religious discrimination in the context of a mixed-motive analysis. Generally, our Court will not consider a claim of error not first presented to the circuit court. *Akers v. Floyd County Fiscal Court,* 556 S.W.2d 146, 152 (Ky.1977). Furthermore, plaintiffs must give proper notice when bringing mixed-motive claims. *Hashem–Younes v. Danou Enterprises Inc.,* 311 Fed.Appx. 777, 779 (6th Cir.2009). Because Mendez has not given notice that the case is one involving "mixed motives," it is not necessary for us to even consider whether the jury instructions properly stated the "mixed-motive" analysis.

Mendez never argues that his termination was based on both lawful and unlawful reasons. Finally, if Mendez was bringing a mixed-motive case, he does not concede that damages are limited under "mixed-motive" analysis. Under Title VII, a plaintiff asserting a mixed-motive claim is entitled only to declaratory relief, limited injunctive relief, and attorney fees and costs where the employer demonstrates that it would have taken the same employment action in the absence of an impermissible motivating factor. 42 U.S.C. § 2000e–5(g)(2)(B). Certainly, Mendez has requested additional damages beyond the ones allowed under a "mixed-motive" case.

Second, Mendez's arguments are based on the contention that the Kentucky Civil Rights Act is interpreted like federal law. He cites KRS 344.020(1)(a) to support this proposition. For the most part, Kentucky jurisprudence has provided that, "[t]he Kentucky [Civil Rights] Act is similar to Title VII ... and should be interpreted consistently with federal law." *See Ammerman v. Bd. of Educ., of Nicholas County,* 30 S.W.3d 793, 797–98 (Ky.2000); *see also Jefferson County v. Zaring,* 91 S.W.3d 583, 586 (Ky.2002).

But, the Kentucky Civil Rights Act does not contain the language found in 42 U.S.C. § 2000e–2(m). And, as commented by the Kentucky Supreme Court in *Meyers v. Chapman Printing Co., Inc.,* 840 S.W.2d 814, 821 (Ky.1992), when the "language tracks the federal law [it] should be interpreted consonant with federal interpretation" of the Civil Rights Act of 1991. Significantly, however, this particular language has not been incorporated into the Kentucky Civil Rights Act and, thus, the analysis does not necessarily have to rely on federal law.

■ Furthermore, it has been held that, "[m]ixed-motive theories of liability are always improper in suits brought under statutes without language comparable to the Civil Rights Act's authorization of claims that an improper consideration was '*a motivating factor*' for the contested action." *See Serafinn v. Local 722, International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America,* 597 F.3d 908, 915 (7th Cir.2010). Therefore, given that Kentucky has not specifically adopted the "mixed-motive" language found in 42 U.S.C. § 2000e–2(m), we shall review this case according to Kentucky jurisprudence and its reference to "mixed-motive" causes of action.

The primary case discussing "mixed-motive" cases in Kentucky is the aforementioned *Meyers v. Chapman Printing.* Therein, the Kentucky Supreme Court describes the "mixed-motive" analysis as one that provides the party alleging discrimination must show that the discriminatory motive was "a contributing and essential factor" and not whether the employer's action was taken "solely because of" the discrimination. *Meyers,* 840 S.W.2d at 823. The Court interpreted the phrase "because of" in KRS 344.040 to mean "substantial factor," "contributing and essential factor," or "essential ingredient," and not "sole cause." *Id.* at 823–824 (Ky.1992); *see also First Property Mgmt. Corp. v. Zarebidaki,* 867 S.W.2d 185, 187–88 (Ky. 1993).

■ Having now highlighted the relevant law for this cause of action, we will examine the pertinent jury instructions. Before doing so, however, we examine requirements for jury instructions in general. In instructing the trial jury, the trial court need only set forth essentials for the jury in a "bare bones" fashion. *Olfice, Inc. v. Wilkey,* 173 S.W.3d 226, 229 (Ky.2005). "The Kentucky practice of 'bare bones' instructions applies to all litigation including civil rights cases." *Lumpkins ex rel. Lumpkins v. City of Louisville,* 157 S.W.3d 601, 605 (Ky.2005). Additionally, the jury instructions do not need elaborate detail but must have the proper balance in providing enough information so that the jury is fully aware of the respective legal duties of the parties. *Olfice,* 173 S.W.3d at 229.

Below are the jury instructions in question:

INSTRUCTION NO. 2

The law in Kentucky provides that it is an unlawful practice for an employer to fail or refuse to hire, or to discharge any individual or otherwise discriminate against an individual with respect to

compensation, terms, conditions or privileges of employment, because of the individual's religion or because of a failure to comply with their employer's religion.

For the purposes of this case, the jury is instructed that it is to consider the acts, conduct, religious beliefs and values of Bambang Sutardjo to be the acts, conduct, religious beliefs and values of Defendant, Board of Trustees of the University of Kentucky.

INTERROGATORY NO. 1

Are you satisfied from the evidence that Plaintiff Fullmer Mendez declined to share the religious beliefs and values of Defendant Sutardjo?

Nine of the twelve jurors answered "Yes" to this interrogatory.

INTERROGATORY NO. 2

If you answered "Yes" to Interrogatory No. 1, do you further believe from the evidence that Plaintiff's declining to share Defendant Sutardjo's religious beliefs and values was a substantial and motivating factor in the University of Kentucky's decision to end his employment at the College of Health Sciences in March 2006?

The jury was unanimous in answering "No" to this interrogatory.

As Mendez himself provides, the determining case in Kentucky involving mixed-motive analysis is *Meyers v. Chapman.* But he maintains that *Meyers* has been overruled and replaced by the analysis in *Desert Palace.* We have already clarified that *Desert Palace* is not the prevailing case. Kentucky, to date, has not incorporated the federal law, 42 U.S.C. § 2000e–2(m), from which *Desert Palace* derives its holdings.

Given that we rely on *Meyers*, Mendez's primary argument disputing the jury instructions herein is the use of "substantial and motivating" factor as the causal link between the alleged wrongful conduct and the injury claimed. In *Meyers*, the discussion concerned the use of "but for." The Court made clear that "the 'but for' language used in the trial court's instructions neither states nor implies 'solely because.' In the context used, 'but for' did not require a finding of sole cause, but only of substantial factor." *Meyers*, 840 S.W.2d at 823.

Later, the Court instructs that "[i]n Kentucky jury instructions do not include evidentiary presumptions." *Id.* at 824. And that, "the jury instructions should be framed only to state what the jury must believe from the evidence in order to return a verdict in favor of the party who bears the burden of proof." *Id.* The Court then discussed the exact language necessary in a discrimination case wherein mixed-motive is implicated:

> Thus, as the trial court properly decided, under Kentucky procedure the "but for" phrase used to express the causation issue was adequate. The "but for" test does not require that the jury find sex discrimination was the exclusive motive for the employee's discharge, but only that it was an essential ingredient. In a civil action seeking damages for a discharge motivated by sex discrimination, a "but for" test is a fair interpretation of the substantial factor standard.

*Id.* Hence, the jury instructions used in Mendez's case adequately captured the essence of the legal requirements in Kentucky in situations involving discrimination under the Kentucky Civil Rights Act.

Support for the above analysis is also found in *First Property Mgmt. Corp.*, 867 S.W.2d at 188. Therein, the Court said:

> We recognize that in 1991 the Federal Civil Rights Act was amended to make it clear, if it wasn't already, that the plaintiff need only show that one of the grounds for discharge declared unlawful

by the Federal Civil Rights Act was "a motivating factor," 42 U.S.C. § 2000e–2(m), which may (or may not) mean something different than the standard stated by the U.S. Supreme Court in *Price Waterhouse* [*v. Hopkins*, 490 U.S. 228, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989)] and by our Court in *Meyers*. Thus, in cases under the Federal Civil Rights Act, if so-called "mixed motives" are involved, the plaintiff has only the burden of showing an "unlawful employment practice ... was a motivating factor," 42 U.S.C. § 2000e–2(m), whereupon the burden of proof shifts to the defendant to avoid liability by showing that the same employment decision would have been made "in the absence of the impermissible motivating factor." 42 U.S.C. § 2000e–5(g)(2)(B). This addresses the reasons underlying the amendment to Title VII to further articulate a cause of action "even though other factors also motivated the ['unlawful employment'] practice." 42 U.S.C. § 2000e–2(m).

But the Court went on to say that:

> These are rules for federal cases tried in equity and without a jury. But cases under the Kentucky Civil Rights Act are claims at law in Kentucky. In such cases, the burden of coming forward with evidence may shift, while the burden of persuasion remains with the plaintiff, and we must fashion an instruction suited to the task. *Meyers*, 840 S.W.2d at 824.

The instructions are reviewed as a whole to determine whether they adequately inform the jury of relevant considerations and provide a basis in law for the jury to reach its decision.

Here, where it was the jury's task to determine whether unlawful discrimination was the real reason for the adverse employment action, we believe that the jury instructions were adequate and not prejudicial to Mendez. Although Mendez provided no "mixed-motive" evidence, the Kentucky Civil Rights Act does not distinguish between the proof necessary to prevail in a single or mixed-motive case. In *Meyers*, the Kentucky Supreme Court held that, as long as the jury was instructed that it need not decide that the protected classification-in this case religion-was the exclusive cause of the discrimination but only that it was an essential element, the jury instruction is acceptable. *Meyers*, 840 S.W.2d at 824. The jury instructions here meet that requirement since they state "substantial and motivating" but not "sole" or "only" factor for the adverse employment action.

In sum, we conclude that the jury instructions provided sufficient guidance for the jury to decide the threshold issue of whether religious discrimination was involved in Sutardjo's decision to terminate Mendez. "[O]n an appeal [the issue concerning] an allegedly erroneous [jury] instruction is whether the instruction misstated the law." *Olfice*, 173 S.W.3d at 229. But, the issue is not which instructions best state the law. *Id.* at 230. Here, the instructions did not misstate Kentucky law and provided sufficient guidance for the jury to make its decision under the facts of this case.

Mendez's reliance on *Desert Palace*, 539 U.S. 90, 123 S.Ct. 2148, and *White v. Baxter Healthcare Corp.*, 533 F.3d 381 (6th Cir.2008), are misplaced. Both cases were decided under the Federal Civil Rights Act rather than the Kentucky Civil Rights Act. Moreover, *White* addressed the issue of summary judgment in a "mixed-motive" employment discrimination case and never makes reference to jury instructions for such a case.

Lastly, Mendez spends a great deal of time contending that the burden-shifting

analysis under *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), has been abolished by *Desert Palace*. In fact, *McDonnell Douglas* and *Desert Palace* are both still credible authority in discrimination cases. As was explained in *Gibson*, 336 F.3d at 514, regardless of the framework used for presenting the evidence, the underlying substantive law remains the same. Ultimately, the question is whether the defendant's real reason was unlawful discrimination. The inquiry at the fact-finding stage remains the same whether a discriminatory reason for the adverse action exists (thereby triggering the mixed-motive analysis) or whether a plaintiff must simply argue against a defendant's proffered nondiscriminatory reason. *Id.* We hold that it was not an error for the trial court to provide the jury with these instructions.

Mendez also argues that, since the trial court utilized the "substantial and motivating factor" language, he was unable to alter his trial strategy and is entitled to a new trial. This argument is without merit. Mendez did not plead "mixed motive" in his complaint but argued "mixed motive" in his response to the Board's motion for summary judgment. In that response, he cited *Meyers* and the language of "substantial and motivating factor" which, he argued, was discarded. However, Mendez was clearly aware of this language. The same language was again stated in the Board and Sutardjo's proposed jury instructions filed April 14, 2010, almost two weeks before the trial.

## II. Failure to Provide Damage Instruction on Lost Future Damages

Mendez argues that the trial court erred in refusing to instruct the jury that it could award him future lost earnings if he proved liability. The jury never had to consider a damage instruction because it did not find that Sutardjo had discriminated on the basis of religion against Mendez. The issue is moot and no reversible error was committed by the trial court.

## III. Summary Judgment on Wrongful Discharge Claims

Mendez argues that the trial court erred when it granted the Board and Sutardjo's motion for summary judgment on the wrongful discharge claims. A review of a trial court's entry of summary judgment is de novo. "The standard of review on appeal of a summary judgment is whether the trial court correctly found that there were no genuine issues as to any material fact and that the moving party was entitled to judgment as a matter of law." *Scifres v. Kraft*, 916 S.W.2d 779, 781 (Ky. App.1996). Finally, since "summary judgment involves only legal questions and the existence of any disputed material issues of fact, an appellate court need not defer to the trial court's decision." *Lewis v. B & R Corp.*, 56 S.W.3d 432, 436 (Ky.App.2001).

▉ Kentucky law permits an employer to discharge an employee "for good cause, for no cause, or for a cause that some might view as morally indefensible." *Wymer v. JH Properties, Inc.*, 50 S.W.3d 195, 198 (Ky.2001). This is otherwise known as the terminable-at-will doctrine. In light of this doctrine, Mendez may only establish a cause of action for wrongful discharge by demonstrating that the termination was contrary to a fundamental and well-defined public policy evidenced by a constitutional or statutory provision, *Firestone Textile Co. Div., Firestone Tire and Rubber Co. v. Meadows*, 666 S.W.2d 730, 731 (Ky.1983); or, that the termination violated fundamental public policy by showing that the discharge was a direct result of his refusal to violate the law in the course of his employment or stemmed from the exercise of a right conferred in a

well-established legislative enactment, *Boykins v. Housing Authority of Louisville*, 842 S.W.2d 527, 530 (Ky.1992).

Mendez claims that his discharge violated the public policy established in Ky. Const. §§ 1 (Fourth), 5, and 8. Section 1 (Fourth) states that Kentucky citizens shall have "[t]he right of freely communicating their thoughts and opinions." Section 5 states:

No preference shall ever be given by law to any religious sect, society or denomination; nor to any particular creed, mode of worship or system of ecclesiastical polity; nor shall any person be compelled to attend any place of worship, to contribute to the erection or maintenance of any such place, or to the salary or support of any minister of religion; nor shall any man be compelled to send his child to any school to which he may be conscientiously opposed; and the civil rights, privileges or capacities of no person shall be taken away, or in anywise diminished or enlarged, on account of his belief or disbelief of any religious tenet, dogma or teaching. No human authority shall, in any case whatever, control or interfere with the rights of conscience.

Lastly, Ky. Const. § 8 states:

Printing presses shall be free to every person who undertakes to examine the proceedings of the General Assembly or any branch of government, and no law shall ever be made to restrain the right thereof. Every person may freely and fully speak, write and print on any subject, being responsible for the abuse of that liberty.

■ First, regarding Ky. Const. § 5, Mendez alleged in Count III of his Complaint that the Board and Sutardjo wrongfully discharged him under this section, that is, because of religious discrimination. Count I of the Complaint, however, alleged religious discrimination pursuant to KRS 344.040. Thus, Mendez's complaint of religious discrimination was litigated under the statutory provisions, and he has no cause of action under the Kentucky Constitution. As noted in *Grzyb v. Evans*, "[w]here [a] statute both declares the unlawful act and specifies the civil remedy available to the aggrieved party, the aggrieved party is limited to the remedy provided by the statute." 700 S.W.2d 399, 401 (Ky.1985).

Although *Grzyb* has been distinguished by *McDonald's Corp. v. Ogborn*, 309 S.W.3d 274, 285, 286 (Ky.App.2009), that distinction has no relevance to this case. *Ogborn* discussed common-law claims of premises liability, negligence, and false imprisonment but observed that claims based on discriminatory employment are subsumed under the Kentucky Civil Rights Act. *Id.* Therefore, Mendez's claim in Count III of the Complaint was determined when the jury rendered its verdict under the Kentucky Civil Rights Act.

■ Now, turning to the argument that he was wrongfully discharged under the public policy purview of the Kentucky Constitution exceptions to the terminable-at-will doctrine, these exceptions were clarified in *Grzyb*. The Court held in *Grzyb* that, besides the failure or refusal of the employee to violate a law in the course of employment, which is not at issue here, the other exception is when a discharge is the result of the employee's exercise of a right conferred by a well-established legislative enactment. "The decision of whether the public policy asserted meets these criteria is a question of law for the court to decide, not a question of fact." *Grzyb*, 700 S.W.2d at 401. Thus, this decision appropriately was determined by the trial court in its grant of summary judgment.

■ As noted by the Board and Sutardjo, claims related to the First Amendment to the U.S. Constitution and Ky. Const. § 1 do not provide a cause of action against private employers for wrongful discharge. *Id.* at 402. Hence, the protections afforded Kentucky citizens under Ky. Const. § 1 are against transgressions of the government and lawmaking bodies, and the constitutional protection of Section I does not limit the employer's right to discharge an employee. *Id.*

This principle, however, depends on whether the employer was a private or public employer. Mendez vehemently expresses that, since the University of Kentucky raised sovereign and governmental immunity as a defense, it has acknowledged that it is a governmental entity and not a private employer. And, in fact, "KRS 164 establish[es] ... that the University of Kentucky operates under the direction and control of central state government and that it is funded from the State Treasury." *See Withers v. University of Kentucky*, 939 S.W.2d 340, 343 (Ky. 1997). Furthermore, Western Kentucky University has been held to be a state agency because it performs the essential state function of educating state citizens and receives money from the state treasury. *Autry v. Western Kentucky University*, 219 S.W.3d 713, 717 (Ky.2007).

But, even though the University of Kentucky may be considered a public employer, the question remains as to the relationship between Ky. Const. §§ 1, 8, and employment. In *Baker v. Campbell County Bd. of Educ.*, 180 S.W.3d 479 (Ky. App.2005), this Court was asked as a matter of first impression whether to extend *Firestone* and its progeny to include a cause of action for retaliatory failure to hire. Ultimately, as Mendez points out, it was concluded that no cause of action for retaliatory failure to hire exists in Ken-

tucky. Nevertheless, the analysis reaffirmed that Ky. Const. § 1 does not in itself sustain a wrongful discharge action. Notably, the *Baker* case also involved a public entity.

■ Reviewing the subject speech, that is, the conversation about the publication of Danish cartoons which included caricatures of the prophet Mohammed, under the purview of federal law and the interpretation of the First Amendment, we still do not believe that it meets either exception to the terminable-at-will doctrine. Mendez would first have to prove that this conversation involved speech that was constitutionally protected. *Leary v. Daeschner*, 349 F.3d 888, 897 (6th Cir.2003). Therein, the necessary elements are described:

> In order to state a retaliation claim under the First Amendment a plaintiff must show that: "1) [she] engaged in constitutionally protected speech; 2)[she] was subjected to adverse action or was deprived of some benefit; and 3) the protected speech was a 'substantial' or a 'motivating factor' in the adverse action."
>
> *Brandenburg v. Housing Auth. of Irvine*, 253 F.3d 891, 897 (6th Cir.2001) (citing *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977)).

*Id.* While we are aware that this case specifically addressed retaliation claims, it remains relevant for its description of protected speech. It goes on to note that public employees have even more standards to establish that the speech at issue is constitutionally protected.

> First, a public employee plaintiff must demonstrate that the speech involved matters of public interest or concern. *Cockrel v. Shelby County Sch. Dist.*, 270 F.3d 1036, 1048 (6th Cir.2001), *cert. denied*, 537 U.S. 813, 123 S.Ct. 73, 154 L.Ed.2d 15 (2002). Second, the plaintiff

must show that her interest in addressing these matters of public concern outweighs the interest of her employer "in promoting the efficiency of the public services it performs through its employees." *Pickering v. Bd. of Educ. of Township High Sch. Dist. 205*, 391 U.S. 563, 568, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968). *Id.* Mendez has not provided any support that the conversation, the nature of which is disputed, was constitutionally protected, or that it caused an adverse employment action, or even that it was a substantial and motivating factor in his termination. This factor is bolstered even more by the fact that he has not shown that the conversation in question concerned matters of public interest or that the interest in addressing these matters outweighs the interest of his employer in providing public service through its employees.

Nor can we ignore the fact that Mendez was hired as a temporary employee, was subject to reassignment when his task was completed, and was still eligible for other positions within the University. It can be argued that Mendez was not discharged at all but abandoned his position. Thus, the trial court did not err in ascertaining that there were no genuine issues as to any material fact and that the moving party was entitled to judgment as a matter of law.

The trial judge was unable to ascertain that Mendez's discharge fell within the ambit of any exceptions to the terminable-at-will doctrine and, therefore, in granting the motion for summary judgment reasoned that Mendez failed to establish a claim cognizable under Kentucky law. We agree with this reasoning and, hence, hold that the trial judge did not err in granting the motion for summary judgment on Counts I and II of Mendez's complaint.

IV. Cross-appeal

Since we have upheld the judgment and jury verdict of the trial court and determined that the trial court did not err in granting summary judgment on Counts II and III of the Complaint, the issues raised by the Board and Sutardjo on cross-appeal are moot and, therefore, we will not address them.

## CONCLUSION

For the foregoing reasons, the judgment of the Fayette Circuit Court is affirmed.

ALL CONCUR.