RENDERED: FEBRUARY 27, 2026; 10:00 A.M.
NOT TO BE PUBLISHED

# Commonwealth of Kentucky

# Court of Appeals

NO. 2024-CA-1279-MR


DALE RUTLEDGE, M.D. AND LAKE
CUMBERLAND WOMEN'S HEALTH
SPECIALISTS                                                                APPELLANTS



                    APPEAL FROM PULASKI CIRCUIT COURT
v.          HONORABLE KAELIN G. REED, SPECIAL JUDGE
                    ACTION NO. 15-CI-00774



CHEVANNA WALKER; ANDREW
WALKER, AS ADMINISTRATOR OF
THE ESTATE OF AUBREY
WALKER; BRIAN STEPHENS; AND
LAKE CUMBERLAND REGIONAL
HOSPITAL, LLC D/B/A LAKE
CUMBERLAND REGIONAL
HOSPITAL                                                                     APPELLEES

AND


                            NO. 2024-CA-1308-MR



CHEVANNA WALKER; ANDREW
WALKER, AS ADMINISTRATOR OF
THE ESTATE OF AUBREY
WALKER; AND BRIAN STEPHENS                         CROSS-APPELLANTS

v.            HONORABLE KAELIN G. REED, SPECIAL JUDGE
ACTION NO. 15-CI-00774


LAKE CUMBERLAND REGIONAL
HOSPITAL, LLC D/B/A LAKE
CUMBERLAND REGIONAL
HOSPITAL; DALE RUTLEDGE, M.D.;
AND LAKE CUMBERLAND
WOMEN'S HEALTH SPECIALISTS                    CROSS-APPELLEES



OPINION
AFFIRMING

** ** ** ** **

BEFORE:  THOMPSON, CHIEF JUDGE; CETRULO AND MOYNAHAN, JUDGES.

MOYNAHAN, JUDGE:  In this consolidated appeal, the Court reviews the direct appeal[1] instituted by the Appellant, Dale Rutledge M.D. and Lake Cumberland Women's Health Specialists, PSC ("Dr. Rutledge"), as well as the cross-appeal[2] initiated by the Appellees/Cross-Appellants, Chevanna Walker, Andrew Walker, as Administrator of the Estate of Aubrey Walker, and Brian Stephens ("the Walkers").  In the direct appeal, Lake Cumberland Regional Hospital ("LCRH"), is named as an Appellee, though the issues therein do not appear to impact LCRH,

---

[1] No. 2024-CA-1279-MR.

[2] No. 2024-CA-1308-MR.

and it did not file an appellate brief in that action. In the cross-appeal, LCRH is named as a cross-appellee and submitted briefs for consideration. After reviewing the extensive trial record, the parties' briefs, and conducting oral argument, we hold that the trial court committed no reversible error with respect to any of the claims in the direct appeal or cross-appeal. Accordingly, as further described in this Opinion, the trial court's various orders for directed verdict and its final judgment following the jury's verdict are affirmed.

## BACKGROUND

This action involves medical negligence claims made by the Walkers against LCRH, as well as Dr. Rutledge and his practice, on claims for informed consent, birth injury, and wrongful death, as well as a battery claim and a claim for punitive damages. Additionally, Chevanna Walker brought a claim for negligence related to gauze negligently left inside her body by Dr. Rutledge following an episiotomy that accompanied Aubrey's birth.

*The Birth*

On August 6, 2014, Dr. Rutledge induced Chevanna for delivery at thirty-eight (38) weeks. He contended the induction of labor was due to a diagnosis of intrauterine growth restriction. The Walkers asserted that Aubrey was a healthy in-utero infant whose prenatal course had been uncomplicated. The Walkers further contended that Aubrey's position and progression of delivery was

not adequately monitored by LCRH staff or Dr. Rutledge. According to Dr. Rutledge, just as Chevanna's labor progressed to the delivery stage, Aubrey unexpectedly presented in frank breech position, where the baby's buttocks presented first rather than her head. Importantly, Dr. Rutledge asserted the breech presentation was discovered when the baby was already crowning on Chevanna's perineum. At that point, Dr. Rutledge determined the safest delivery method was vaginally, with forceps, rather than via cesarean section. The Walkers disputed this and further argued that the vaginal breech delivery was outside of the informed consent form signed by Chevanna earlier that morning.

The manner of Aubrey's breech delivery was disputed at trial, but all parties agreed it took about four to five minutes. However, as Aubrey emerged and Dr. Rutledge cut the umbilical cord, the baby was lifeless and not breathing.[3] Realizing the baby's condition, Dr. Rutledge moved her to the warmer and initiated positive pressure ventilation to resuscitate her, and a code was called. Shortly thereafter, hospital staff took over and Dr. Rutledge continued his treatment of Chevanna, who still required an episiotomy repair.

LCRH staff nurses, who were certified by the Neonatal Resuscitation Program ("NRP"), began resuscitation efforts on Aubrey, and an anesthesiologist

---

[3] Aubrey's initial APGAR score was zero out of 10—based on the baby's observed appearance, pulse, grimace response (reflex), activity or muscle tone, and respiration.

who responded to the code took over shortly thereafter. The Walkers, though, pointed out that the doctor who took over was not certified by NRP. In any event, following resuscitation efforts made at LCRH, Aubrey was transported to the University of Kentucky ("UK") for admission to the NICU. Chevanna requested to leave LCRH so she could travel to UK to be with the baby. Sadly, Aubrey died shortly thereafter.

Post birth, x-rays revealed multiple bone fractures. Aubrey was born with fractures of her right femur, both humeri, and right clavicle. The Walkers claimed these fractures were the result of excessive force by Dr. Rutledge and improper use of the forceps (*i.e.*, medical negligence). The defense was that there was no negligence and a suggestion that the fractures were the result of very thin bones or "gracile bone dysplasias." Both parties presented expert testimony in support of their positions. Importantly, the defense had no expert testimony that Aubrey suffered from prenatal conditions that made her death inevitable.

*The Retained Gauze and Chevanna's Infection*

Chevanna did not return to Dr. Rutledge after leaving LCRH. Then, eight days after the delivery, Chevanna presented to the Emergency Room at a different hospital with complaints of fever, fast heart rate, and vaginal discharge. At the ER, she was treated by Dr. Mohammed Yusuf, who performed a pelvic examination and identified gauze in her vaginal canal. At trial, Dr. Rutledge

admitted responsibility for neglecting to remove the gauze. "It is completely on me. It is my fault. . . . I take full responsibility for that. It should not have happened." Dr. Yusuf was able to manually remove the gauze without surgery or anesthesia, although Chevanna did require antibiotics to treat infection, and another hospital stay. Dr. Yusuf opined that the gauze could have caused Chevanna's infection.

*Punitive Damages Claims*

At the directed verdict stage, LCRH made a general motion for directed verdict regarding punitive damages without specifying the gauze claim, and Dr. Rutledge joined.

Based on the proof offered, the Walkers moved for a directed verdict on Dr. Rutledge's liability associated with the claim for retained gauze. The trial judge indicated the court was inclined to grant the directed verdict motion based solely on Dr. Rutledge's testimony, but that it was not going to do so at the time out of concern that directing a verdict on the peripheral gauze issue might prejudice Dr. Rutledge on the more serious birth injury and wrongful death claims. The trial court also indicated that it would instruct the jury on Dr. Rutledge's duty with regards to the gauze in a separate instruction from the other claims and "if the jury gets it wrong, we'll take it up on JNOV."[4]

---

[4] Judgment Notwithstanding the Verdict ("JNOV").

Both at the close of the Walkers' proof and at the close of defense proof, LCRH and Dr. Rutledge moved for directed verdict on the Walkers' claims for punitive damages. The trial court overruled the defense motions for directed verdicts on punitive damages, reasoning a jury could find gross negligence related to informed consent, birth injury, or wrongful death claims. Neither the Walkers nor the trial court mentioned the retained gauze as a basis to overrule the defense motions for directed verdict related to punitive damages.

*Jury Verdict*

After the eleven-day trial, the jury deliberated for around three hours and returned a defense verdict for Dr. Rutledge and LCRH, respectively, on all the claims related to the management and delivery of Aubrey. On the claim for retained gauze, the jury awarded $500,000 in compensatory damages for pain and suffering. The jury also awarded $1,000,000 in punitive damages, ostensibly related to the Plaintiffs' sole successful claim related to the retained gauze. The jury returned the verdict on December 16, 2023, and the trial court entered its judgment on March 5, 2024.

*Post-Trial Motions and Issues Appealed*

After the entry of the Judgment, the Walkers filed a motion for a new trial on all claims for which the jury returned defense verdicts.[5] On October 14, 2024, the trial court denied the Walkers' motion in its entirety and also denied the Rutledge parties' request for JNOV regarding the punitive damages' verdict. Dr. Rutledge also filed a Motion for JNOV and Remittitur and a Motion to Alter, Amend, or Vacate the Judgment Regarding Recoverable Costs. Dr. Rutledge theorized that the Court should have granted directed verdict on the claim for punitive damages or a judgment notwithstanding the verdict as to the $1,000,000 punitive damages award, because the punitive damages instruction would never have been given for the retained gauze claim in the absence of the claims for informed consent, birth injury, and wrongful death. Alternatively, Dr. Rutledge argues that the punitive damages award was unconstitutional and should have been remitted because it was grossly excessive. Dr. Rutledge made an additional post-trial motion for recovery of costs on the basis he prevailed on the primary issues at trial. After the trial court denied all post-trial motions, Dr. Rutledge appealed.

The Walkers also appealed asserting that multiple reversible errors occurred at trial. They maintain the trial court failed to instruct on LCRH's general

---

[5] The exception being Chevanna Walker, who did not make a motion for a new trial for the verdict in her favor for Dr. Rutledge's post-birth treatment resulting in the retained gauze.

or ordinary negligence duty under common law, failed to allow a viable medical

battery claim to reach the jury, and erred in denying the Walkers a directed verdict

on their informed consent claim. Finally, the Walkers asserted a failure to grant a

mistrial based on comments by LCRH's counsel during opening statements. This

argument also requires an analysis of the admonition given by the trial court.

Other trial issues and rulings will be further developed as they are

analyzed in this Opinion.

## STANDARD OF REVIEW

*Judicial Review of Directed Verdicts & JNOV* (*Judgment Notwithstanding Verdict*)

Kentucky jurisprudence provides clear standards of review for both

directed verdict and JNOV motions:

> The standard of review regarding a motion for a directed
> verdict or JNOV has been described as a difficult one for
> an appellant to meet. *Peters v. Wooten*, 297 S.W.3d 55,
> 65 (Ky. App. 2009). Our court in *Taylor v. Kennedy*, 700
> S.W.2d 415 (Ky. App. 1985) described it as follows:
>
> > In ruling on either a motion for a directed
> > verdict or a motion for a [JNOV], a trial
> > court is under a duty to consider the
> > evidence in the strongest possible light in
> > favor of the party opposing the motion.
> > Furthermore, it is required to give the
> > opposing party the advantage of every fair
> > and reasonable inference which can be
> > drawn from the evidence . . .
>
> *Id.* at 416 (citation omitted). We may not disturb the
> ruling unless the decision is clearly erroneous. *Peters*,

297 S.W.3d at 65 (citation omitted). As such, a denial of a directed verdict or JNOV "should only be reversed on appeal when it is shown that the verdict was palpably or flagrantly against the evidence such that it indicates the jury reached the verdict as a result of passion or prejudice." *Id.* (citation omitted).

*Estate of Moloney v. Becker*, 398 S.W.3d 459, 461 (Ky. App. 2013). A "directed verdict is appropriate 'where there is no evidence of probative value to support an opposite result' because '[t]he jury may not be permitted to reach a verdict upon speculation or conjecture.'" *Toler v. Süd-Chemie, Inc.*, 458 S.W.3d 276, 285 (Ky. 2014), *as corrected* (Apr. 7, 2015) (citation omitted).

*Punitive Damages*: *Constitutionality*

This Court is required to perform a *de novo* review to assess whether an award of punitive damages satisfies the due process requirements spelled out by the United States Supreme Court in *State Farm Mutual Automobile Insurance Co. v. Campbell*, 538 U.S. 408, 123 S. Ct. 1513, 155 L. Ed. 2d 585 (2003), and *BMW of North America, Inc. v. Gore*, 517 U.S. 559, 116 S. Ct. 1589, 134 L. Ed. 2d 809 (1996). *Yung v. Grant Thornton, LLP*, 563 S.W.3d 22, 63 (Ky. 2018). If a punitive damage award exceeds constitutional limits, remittitur is appropriate. *Id*. "A jury uses a punitive damage award to punish a defendant, deter future wrongdoing, and express its moral condemnation." *Id*. at 64 (citations omitted). Relevant here, "[p]unitive damages are also available if gross negligence is shown." *Id*. at 65 (citation omitted). "Gross negligence means a wanton or

-10-

reckless disregard for the lives, safety, or property of others." *Saint Joseph Healthcare, Inc. v. Thomas*, 487 S.W.3d 864, 870 (Ky. 2016) (internal quotation marks and citation omitted).

*Punitive Damages*: *Remittitur*

In *Yung*, the Kentucky Supreme Court referenced that:

> The Court of Appeals noted in its opinion that this Court has never explicitly endorsed its authority to order remittitur of punitive damages, although that court has used such authority in *Ragland v. DiGiuro*, 352 S.W.3d 908 (Ky. App. 2010) and *McDonald's Corp. v. Ogborn*, 309 S.W.3d 274 (Ky. App. 2009).[6] We take this opportunity to clarify that remittitur of a punitive damage award is proper in a case where the facts justify it.

*Yung*, 563 S.W.3d at 61–62. "Remittitur is the process used to reduce a damage award when an error is discovered. *See Black's Law Dictionary* (10th ed. 2014)." *Id*. at 62. Remittitur may involve "an order awarding a new trial, or a damages amount lower than that awarded by the jury and requiring the plaintiff to choose between those alternatives." *Id.* (internal quotation marks and citation omitted).

There are judicial limits to applying remittitur:

> *Louisville & Nashville Railroad Co. v. Complete Auto Transit*[7] explained the limits placed on Kentucky courts'

---

[6] "Our Court of Appeals has reduced punitive damage awards in *Ragland*, 352 S.W.3d at 924 (reducing $60 million punitive damage award to $30 million), and *McDonald's*, 309 S.W.3d at 301 (reducing $1 million punitive damage award to $400,000)." *Yung*, 563 S.W.3d at 63.

[7] The full citation is *Complete Auto Transit v. Louisville & Nashville R.R. Co.*, 273 S.W.2d 385 (Ky. 1954).

power to correct an excessive award by remittitur likewise: "It is only where the items constituting the damages recovered are separable so that the court may eliminate those not properly recoverable from those which are recoverable that a remittitur may be ordered." (citations omitted).

*Yung*, 563 S.W.3d at 62.

*Jury Instructions and Admonitions*

"Trial courts are vested with discretion in deciding what admonitions and instructions to the jury are appropriate under the evidence and attendant circumstances." *Norton Healthcare, Inc. v. Disselkamp*, 600 S.W.3d 696, 730 (Ky. 2020) (internal quotation marks and citation omitted).

"Trial courts, however, have the authority to deny requested instructions and their decision to do so will only be reversed for an abuse of discretion." *Nazar v. Branham*, 291 S.W.3d 599, 608 (Ky. 2009), *as modified on denial of reh'g* (Aug. 27, 2009) (citation omitted). While the lower court's decision whether to deny a requested instruction is reviewed for an abuse of discretion, "[a] properly preserved challenge to the contents of a given jury instruction is a question of law subject to de novo review on appeal." *Disselkamp*, 600 S.W.3d at 709–10. "When the question is whether a trial court erred by: (1) giving an instruction that was not supported by the evidence; or (2) not giving an instruction that was required by the evidence; the appropriate standard for appellate review is whether the trial court abused its discretion." *Sargent v. Shaffer*, 467

S.W.3d 198, 203 (Ky. 2015), *as corrected* (Aug. 26, 2015), *overruled on other grounds by University Medical Center, Inc. v. Shwab*, 628 S.W.3d 112 (Ky. 2021). "The test for abuse of discretion is whether the trial judge's decision was arbitrary, unreasonable, unfair, or unsupported by sound legal principles." *Hunziker v. AAPPTec, LLC*, 603 S.W.3d 277, 283 (Ky. App. 2020) (citations omitted).

Similarly, appellate courts review the decision whether to issue an admonition under the abuse of discretion standard. *Disselkamp*, 600 S.W.3d at 730. Kentucky law recognizes "that an admonition to the jury to disregard an improper argument . . . cures the error unless it appears the argument was so prejudicial, under the circumstances of the case, that an admonition could not cure it." *Jacobsen v. Commonwealth*, 376 S.W.3d 600, 611 (Ky. 2012), *as corrected* (Sep. 11, 2012) (citations omitted).

*Mistrial Standard*

"A trial court has broad discretion in ruling on a motion for a new trial and we will not disturb the ruling absent an abuse of that discretion." *Lewis v. Grange Mut. Cas. Co.*, 11 S.W.3d 591, 593 (Ky. App. 2000) (citation omitted). Mistrials are extreme remedies that should only be utilized when there is a fundamental defect in the proceedings and a manifest necessity for such action. *Commonwealth v. Padgett*, 563 S.W.3d 639, 645 (Ky. 2018) (citation omitted). "The cause of the need for mistrial must be of such character and magnitude that a

litigant will be denied a fair and impartial trial, and the prejudicial effect can be removed in *no other way.*"  *Id*. (internal quotation marks and citation omitted).

## ANALYSIS

We elect to address the issues raised on appeal by the Walkers first, then address those raised by Dr. Rutledge.  While LCRH has responded on any issue involving it as a party, it ultimately seeks not to disturb the successful verdicts and judgments it received across the board at the trial court.

### *Issues Raised by the Walkers on Cross-Appeal*

### *Trial Court Did Not Err by Declining to Give General Negligence Instruction*

The Walkers claim[8] they presented substantial evidence and testimony that LCRH violated its common law duty of ordinary care (and that of its nurse employees) owed to the Walkers in the care and treatment of Chevanna and Aubrey.  Yet, they complain that the trial court's instructions did not include LCRH's general negligence duty under common law, erroneously leaving the jury with no legitimate path to a verdict against LCRH on the negligence claims brought against it.

---

[8] In LCRH's appellee brief in the cross-appeal filed by the Walkers, LCRH argues the Walkers' brief is deficient under Kentucky Rules of Appellate Procedure ("RAP") 32(A)(4) and should be stricken because it fails to "contain at the beginning of the argument a statement with reference to the record showing whether the issue was properly preserved for review and, if so, in what manner."  However, we find substantial compliance by the Walkers' detailed cites to the record.

-14-

The jury instruction used at trial provided that, "It was the duty of Defendant LCRH and its employees in establishing and following procedures regulating the administration of care to patients, to exercise the degree of care and skill ordinarily expected of reasonable and prudent hospital under similar circumstances."[9]

Specifically, the Walkers assert that the qualifying phrase "in establishing and following procedures" clause was too narrow and limited the duty of LCRH to those two specified categories of conduct. LCRH argues the instruction's language correctly stated the applicable law and was taken verbatim from § 23.13 of *Kentucky's Instruction to Juries*, which is Kentucky's well-recognized instructions treatise.[10] We cannot agree that the instruction given to the jury foreclosed any legitimate verdict pathway for the Walkers. We find precedent in the Kentucky Supreme Court decision of *Humana of Kentucky, Inc. v. McKee*, 834 S.W.2d 711, 722-23 (Ky. App. 1992). In *McKee*, the hospital was appealing a jury verdict against it, arguing the trial court erred in giving both the instruction given herein and an instruction on ordinary care. The Court held that the use of both instructions in that case, with evidence of a specific violation of a statutory

---

[9] Jury Instruction No. 5 used at trial.

[10] Both parties had tendered a bare bones instruction that did not include the clause above. The standard of care a hospital owes to a patient is that standard expected of a reasonably competent hospital, acting in the same or similar circumstances. *Lake Cumberland Reg'l Hosp., LLC v. Adams*, 536 S.W.3d 683, 696 (Ky. 2017).

duty, was not reversible error. Similarly, it would not have been error to provide both instructions in this case. However, the Court also explained that the "in following procedures" language in an instruction does not impose separate legal duties, but instead functions as qualifying language to be utilized in defining a hospital's duty to exercise ordinary care. *Id.* at 723. We find *McKee* on point and conclude the trial court did not err in giving a negligence instruction that distilled the various theories of hospital liability down into a single theme which the Walkers' counsel had every opportunity to flesh out during closing arguments. For example, the instruction given to the jury did not preclude counsel from explaining that LCRH's duty to follow procedures was not narrow or limited and was inclusive of the hospital's responsibility for resuscitation, the nurses' role as a patient advocate, or any other theory the Walkers wanted to emphasize for the jury.

The trial court has discretion to decide whether to use or deny each party's tendered instructions. *Sargent*, 467 S.W.3d at 203. Here, we find no abuse of discretion by the trial court in giving a single instruction often used to define a hospital's duty to exercise ordinary care. We are not persuaded that this jury instruction prevented the jury from finding in the Walkers' favor on any theory supported by the evidence.

*Trial Court Did Not Err in Directing Verdict to LCRH on Informed Consent Claim*

The Walkers next claim the trial court erred by granting a directed verdict to LCRH on the informed consent claim. On appeal, the Walkers claim the trial court misconstrued Kentucky law by finding that obtaining informed consent was only a duty of physicians, not hospitals or nursing staff. The Walkers point to the testimony of nurse expert Jane Payne that LCRH nurses were responsible for advocating for Chevanna to ensure informed consent had been given. The plaintiffs also point to the testimony of Dr. Landon who testified that the general consent form signed would not suffice for informed consent for a vaginal breech delivery.

In contrast, LCRH also points to nurse expert Payne's testimony that a nurse's only duty in regard to informed consent is "simply witnessing the patient's signature" on a consent form because physicians explain the risks and benefits of procedures they perform. Here, Payne acknowledged that LCRH's nurses witnessed Chevanna's signature on the consent form. Further, LCRH's nursing expert testified that it is not the nurse's role to explain procedures or obtain informed consent. The jury was instructed as to the physician's duty to obtain informed consent and as previously noted, the hospital's duties owed through their staff.

Having reviewed the entire record before the trial court, we find no error in the court's determination that there was insufficient evidence in this case that these nurses had any duty in obtaining informed consent beyond the witnessing of the patient's signature. The Walkers were able to argue, and did, that the nurses failed to advocate for Chevanna.

*Trial Court Did Not Err in Denying Walkers' Motion for Directed Verdict on the Informed Consent Claim Against the Rutledge Defendants*

The Walkers had also moved for directed verdict in their favor on the informed consent claims against Dr. Rutledge. The Walkers contend that under the informed consent statute in Kentucky Revised Statutes ("KRS") 304.40-320, only an emergency provides an exception to obtaining informed consent before providing a health care service. They claim Dr. Rutledge only presented an "unreasonable treatment" defense that is not a recognized exception to the duty to obtain informed consent under Kentucky law. The Walkers also claim that Dr. Rutledge "conceded that he did not do what was required of him by law" so the Walkers were entitled to a directed verdict on the informed consent claim.

Dr. Rutledge counters that it was not clear error for the trial court to deny the Walkers' motion for a directed verdict on the informed consent claim against him. Bolstering his point, Dr. Rutledge highlights testimony from two experts that the informed consent given to Chevanna met the standard of care.

-18-

Following arguments from both parties on the issue, the trial court remarked that, "I think it's an open question. I think there's evidence in the record that goes both ways on that. So I'll deny that." Similarly, we agree that the trial court properly denied the Walkers' directed verdict motion on informed consent. Considering the evidence in a light favorable to the party opposing the motion, there was not a complete absence of proof on this issue, and it remained a disputed issue of fact upon which reasonable minds could differ. *See Jewish Hosp. & St. Mary's Healthcare, Inc. v. House*, 563 S.W.3d 626, 632 (Ky. 2018).

*Trial Court Did Not Err in Directing Verdict to the Rutledge Parties on Battery*

The Walkers also argue they presented uncontradicted evidence at trial that Chevanna never provided consent for a vaginal breech delivery and further claim this was admitted by Dr. Rutledge. They assert the trial court committed error in taking a factual dispute from the jury and failing to instruct on a viable claim as required under Kentucky law.

Dr. Rutledge counters that the trial court properly granted a directed verdict to him on the medical battery claim, citing to *Vitale v. Henchey*, 24 S.W.3d 651, 658 (Ky. 2000). Therein, the Supreme Court clarified that an essential element of battery is the lack or absence of consent. *Id.* When Chevanna presented to LCRH for induction of labor and delivery, she reviewed and executed a consent form acknowledging Dr. Rutledge would perform the delivery. At trial,

-19-

Chevanna testified she consented to Dr. Rutledge performing the delivery and exercising his best judgment. The dispute in this case was whether the consent was sufficient to encompass the procedure that Dr. Rutledge ultimately performed.

Challenges arose when the parties and trial court set out on the task of drafting cogent jury instructions that would allow the jury to consider both medical battery—an intentional tort defined by the absence of consent—and informed consent—a negligence-based tort regarding the sufficiency of consent. The defense argued that under Kentucky jurisprudence medical battery is defined by the absence of consent, while an informed consent claim encompasses any claim regarding the sufficiency of the informed consent. After taking time to further examine *Vitale*, and after hearing all the evidence, the trial court ultimately concluded the Walkers could not maintain—as a matter of law—actions simultaneously for both a battery and an informed consent claim.

On review, we agree with the trial court's conclusion that the evidence in this case did not support a separate battery instruction because sufficiency of consent, rather than absence of consent or revocation of consent, was at issue. *See Coulter v. Thomas*, 33 S.W.3d 522 (Ky. 2000). In *Vitale*, there was no consent from the one with capacity to give that consent, so an action for battery could still be maintained. 24 S.W.3d at 657. *Vitale* makes clear that in Kentucky under certain factual circumstances, the claim of battery may arise in addition to a claim

-20-

for medical malpractice. *Andrew v. Begley*, 203 S.W.3d 165, 171 (Ky. App. 2006). Likewise, *Vitale* made clear that the physician's lack of intent to harm the patient is not a bar to an action for a battery. 24 S.W.3d at 658.

Still, our courts have previously held that it is generally inappropriate to allow the same conduct to serve as the basis for both a negligence and an intentional tort claim. *Ten Broeck Dupont, Inc. v. Brooks*, 283 S.W.3d 705 (Ky. 2009). The trial court's analysis on this question was thoughtful and not based on any clear error. Consequently, we affirm the trial court's decision not to send the medical battery claim to the jury.

*No Reversible Error in Trial Court's Handling of LCRH's Opening Statement*

The Walkers argue the trial court failed to grant a mistrial after LCRH's counsel suggested that Aubrey would never have survived birth due to fetal malformations. Specifically, counsel for LCRH stated several times that the baby could not have survived on her own. The jury was shown a slide that read that the baby's in utero malformations were such that "[a]s soon as she was unplugged from the life support that was her mother, she could not sustain life on her own." Following objections, LCRH's opening was suspended for the remainder of the day as counsel conferred with the trial court to determine how this should be addressed. Ultimately, the trial court crafted an admonition which was read to the jury as follows:

-21-

Yesterday, I told you that opening statements and closing arguments are not evidence, and that you should not consider them as such. During Lake Cumberland's opening statement, you were told that the evidence in this case would prove that Aubrey Walker was a baby with "multiple prenatal and postnatal conditions who could not survive on her own." I want to address those statements so that there is no misunderstanding. The hospital will not bring in an expert to tell you that this baby could not survive on her own outside the womb. No one will testify that Aubrey's death was a foregone conclusion. You are to disregard these statements in their entirety and any implications or inferences that may arise from those statements. If you took any notes on those statements, you are instructed to mark out those statements in your notepad and you are not to consider those notes in your deliberations. Everyone understand? Okay. Alright, with that being said, I will invite counsel back up and we'll continue with opening statements.

While the Walkers moved for a mistrial, the trial court denied the motion, determining that this admonition would be sufficient. At the close of evidence, LCRH asked the court not to allow the Walkers to refer to the admonition in its closing, claiming subsequent testimony at trial had made the admonition unnecessary. LCRH asserted that there had been testimony at trial regarding the low percentage chance of Aubrey surviving past birth. After listening to arguments and after having heard the evidence over eleven days of trial, the court directed counsel for the Walkers, "you can make the argument just don't wave the admonition in front of the jury." Having reviewed the entire testimony relied upon by LCRH, we understand the Walkers' concern with the

-22-

slide and opening statements of counsel. LCRH acknowledges that it had no expert witness that linked any underlying condition with Aubrey's death. Stated another way, there was no testimony that Aubrey suffered from some prenatal condition that made her death inevitable as was clearly suggested by the hospital. Thus, we believe the statements were improper. However, the question on appeal is whether the improper statements warranted the extreme remedy of a mistrial or whether the admonition was sufficient.

The Walkers contend the court's initial admonition—combined with its later limitation on referencing the admonition—was simply insufficient to cure the prejudice caused by the errant comments in LCRH's opening. LCRH asserts that even if its opening statement comments went beyond available expert evidence on Aubrey's prenatal condition, the court's admonition cured any prejudice inflicted on the Walkers. Reluctantly, we agree with LCRH.

The admonition herein was strongly worded, read by the trial court and made the vital point explicitly clear—Aubrey's death was not a foregone conclusion. "A jury is presumed to follow an admonition." *Jefferson v. Eggemeyer*, 516 S.W.3d 325, 338 (Ky. 2017). "[A]n admonition is presumed sufficient to cure errors." *Parker v. Commonwealth*, 291 S.W.3d 647, 658 (Ky. 2009). Here, the trial court carefully weighed the Walkers' assertion that the opening statement went beyond any expected expert testimony the hospital would

offer or had disclosed prior to trial. The court utilized a standard mechanism for curing any prejudice that might have resulted. Our precedents would not have counseled otherwise. An improper argument merits reversal, "only when it is prejudicial *and* results in injustice or deprives a party of a fair and impartial trial." *Mason v. Stengell*, 441 S.W.2d 412, 416 (Ky. 1969) (emphasis added) (citing *Town of Wingo v. Rhodes*, 28 S.W.2d 465 (Ky. 1930)). Arguments, furthermore, should be considered as a whole, keeping in mind the wide latitude to be afforded to counsel. *Miller v. Commonwealth*, 283 S.W.3d 690, 704 (Ky. 2009). Finally, "[i]t is beyond question that the trial judge is in the best position to assess any actual prejudicial effect." *First & Farmers Bank of Somerset, Inc. v. Henderson*, 763 S.W.2d 137, 142 (Ky. App. 1988).

Later, following the close of evidence, the court let the parties argue their respective positions regarding the expert medical testimony the jurors had heard. We hold it was not an abuse of discretion for the trial court to grant a strong admonition—in lieu of a mistrial—during the defense opening. Likewise, it was not an abuse of discretion when the court on review of the evidence presented at trial, determined not to reiterate the admonition nor allow it to be sent back with the jury for deliberations. Again, counsel for the Walkers was free to make the argument that the defense had no evidence that Aubrey could not have survived

-24-

regardless of any negligence.  The trial court did not abuse its discretion in denying the extreme remedy of a mistrial.  *Lewis*, 11 S.W.3d at 593.

*No Error in Denying Rutledge Parties' Motions for Directed Verdict on Punitive*

*Damages Associated with the Retained Gauze Claim*

Dr. Rutledge first argues that it was clear error for the trial court to overrule his motions for directed verdict and JNOV with respect to punitive damages.  The Walkers claim that the Rutledge parties never objected to a punitive damages' instruction being given with respect to Dr. Rutledge's post-birth care and argue therefore that issue was not preserved by Dr. Rutledge.  Ultimately, the Walkers contend that they have consistently maintained (as seen in their proposed jury instructions) that the jury could award punitive damages on any of their claims for which compensatory damages were awarded.

On the issue of punitive damages related to the retained gauze, Dr. Rutledge asserts that while the Walkers disclosed seven experts, none of them testified at trial in any way regarding the retained gauze.  Dr. Rutledge complains that the only proof at trial related to the retained gauze claim was when Plaintiffs' counsel read into the record excerpts from Dr. Yusuf's testimony about his removal of the gauze—and even then, Dr. Yusuf did not offer any opinions on the standard of care.  Consequently, Dr. Rutledge highlights that the Walkers' trial proof on the retained gauze claim—the introduction of Dr. Yusuf's deposition

testimony and Dr. Rutledge's trial testimony concerning no intention to leave the retained gauze—took less than twenty (20) minutes of the eleven-day trial. The Walkers counter that the trial court properly rejected Dr. Rutledge's challenge to the punitive damages award.[11] Dr. Rutledge asserts that the Walkers failed to offer any evidence of conduct by Dr. Rutledge that constituted gross negligence. Specifically, Dr. Rutledge complains that the trial record is devoid of evidence— particularly any expert medical opinions—that the inadvertently-retained gauze was gross negligence. Further, Dr. Rutledge argues the only evidence presented on the issue of punitive damages for the retained gauze was the trial testimony of Dr. Rutledge, who accepted fault for leaving the gauze in the body of Chevanna. The problem, according to Dr. Rutledge, is that the jury heard no evidence to support the additional finding of gross negligence, and that his own trial testimony does not establish that inadvertently leaving in gauze during an episiotomy repair was outrageous or demonstrated wanton or reckless disregard for safety, as required for gross negligence. Ultimately, Dr. Rutledge also argues that whether the retention of gauze under these circumstances reflected gross negligence was outside the common knowledge of a layperson.

---

[11] While the Walkers also argue the issue was not preserved by Dr. Rutledge, this Court's review of the video record cited by Dr. Rutledge showed that they did join in LCRH's motion for directed verdict on punitive damages, so this Court considers the issue preserved by Dr. Rutledge.

Dr. Rutledge also makes a related argument that although the jury instructions were not erroneous on their face, the punitive damages instruction would never have gone to the jury if the case were merely about the claim for retained gauze, so the Walkers were never entitled to a punitive instruction on the gauze claim. In rebuttal, the Walkers point out that their own instructions accounted for the possibility of punitive damages for the retained gauze, as well as for all claims that made it into the instructions. Persuasively, the Walkers allude to the trial court's language in its Order Denying the Motion for a New Trial, where it commented that:

> In the hours of discussions and voluminous filings on the subject, no attempt was made by any party to parse through which of the myriad claims might give rise to the imposition of punitive damages and no party suggested a structure for the instructions that would have allowed punitive damages arising only from the death of Aubrey Walker, as opposed to the after-birth treatment of Chevanna.

In addition to contesting whether Dr. Rutledge did in fact specifically preserve his challenge to a punitive instruction on the issue of retained gauze, the Walkers further argue that Dr. Rutledge is judicially estopped from arguing whether there needed to be expert evidence of gross negligence because LCRH, as co-defendant, successfully argued the Walkers could not present expert testimony about gross negligence. The Walkers suggest that while LCRH made the successful motion, Dr. Rutledge benefited equally from the ruling and made no

objection or efforts to distance themselves from the motion or the benefit gained, and so should be judicially estopped from arguing about the absence of expert testimony supporting the punitive damage award.

The Walkers argue that the factors[12] of judicial estoppel discussed in *Hisle v. Lexington-Fayette Urban County Government*, 258 S.W.3d 422, 434–35 (Ky. App. 2008), apply because LCRH—with the tacit support of Dr. Rutledge as a mutual beneficiary of the ruling—persuaded the trial court to bar any evidence of recklessness or gross negligence.  Most relevant to the Walkers' rebuttal was the third factor—whether the party seeking to assert an inconsistent position would derive an unfair advantage or impose an unfair detriment on the party opposed if not estopped—because LCRH could not have argued at the motion *in limine* stage to prevent expert proof of gross negligence that one of the bases for a directed verdict on the issue of punitive damages was a lack of expert testimony on the issue of gross negligence.

---

[12]

> Although there is no absolute general formula for this principle, several factors have been recognized such as: (1) whether the party's later position is clearly inconsistent with its earlier position; (2) whether the party succeeded in persuading a court to accept the earlier position; and (3) whether the party seeking to assert an inconsistent position would derive an unfair advantage or impose an unfair detriment on the opposing party if not estopped.

*Hisle v. Lexington-Fayette Urban Cnty. Government*, 258 S.W.3d 422, 434–35 (Ky. App. 2008).

Alternatively, the Walkers argue that if judicial estoppel does not apply to Dr. Rutledge's arguments regarding punitive damages, then regardless, expert testimony is not required to find gross negligence where a physician has admitted error, nor is it required in *res ipsa loquitor* cases. Because we find the Walkers' arguments persuasive and view the jury's verdict as not palpably or flagrantly against the evidence such that it indicates passion or prejudice, we will not disturb the trial court's denial of Dr. Rutledge's directed verdict motion on punitive damages.

With the motion *in limine* in effect precluding the introduction of expert testimony on the standard of gross negligence, the question of gross negligence triggering punitive damages was properly a fact question for the jury where Dr. Rutledge conceded fault, and the facts supported a *res ipsa loquitor* theory of the case. Thus, we agree with the Walkers that the jury was well within its bounds to decide whether Dr. Rutledge's post-birth actions and omissions constituted gross negligence.

*No Error in Declining to Apply Remittitur to Punitive Damages Award*

Dr. Rutledge argues on appeal that the punitive damages award was grossly excessive and thus unconstitutional. He cites to *Yung*, 563 S.W.3d at 65, for the three factors a reviewing court assesses when considering whether an award is grossly excessive: the degree of reprehensibility of the defendant's conduct, the

disparity or ratio between harm or potential harm suffered by plaintiffs and the punitive damages award, and the difference between the punitive damages award and penalties imposed for similar misconduct. Dr. Rutledge first argues that there was no evidence of reprehensible conduct, based on the five factors of reprehensibility in *Yung*, 563 S.W.3d at 66. The gravamen of his argument is that the physical injuries suffered by Chevanna were cleared by antibiotics and the failed removal of the gauze was the result of mere accident along with the heavy bleeding associated with the episiotomy repair. Dr. Rutledge also contends that $500,000 in compensatory damages does not reflect the real harm of the retained gauze[13]—where total medical expenses for that injury were less than five figures and required no follow-on medical treatment. Consequently, Dr. Rutledge argues the $1,000,000 in punitive damages are proportionally much higher than a two to one (2:1) ratio between punitive and compensatory damages.

Ultimately, we are persuaded by the Walkers' arguments on the issue of remittitur. First, this Court agrees there was evidence of reprehensibility where Dr. Rutledge's wrongdoing caused physical harm, and the jury could infer from Dr. Rutledge's trial testimony conceding fault on the retained gauze that there was indifference or recklessness. Based on these two factors (physical harm and

---

[13] Notably, Dr. Rutledge has not appealed the $500,000 compensatory damages award against him for the retained gauze.

-30-

indifference/recklessness), the jury could properly find reprehensible conduct to trigger the imposition of punitive damages. Secondly, we are persuaded that the punitive damages award is not excessive—where the ratio between the harm (reflected in the jury's fact finding of $500,000 in compensatory damages) and the punitive damages is two-to-one (2:1). Finally, while Dr. Rutledge cites cases of retained medical items, none of those involved items left in this particular region of a woman's body. Applying a *de novo* review, we find the punitive damages award was not constitutionally excessive.

### *No Abuse of Discretion in Denying Costs to Dr. Rutledge*

Dr. Rutledge finally argues that the trial court abused its discretion in denying his motion for costs. The thrust of this argument is that Dr. Rutledge prevailed in the defense of the informed consent birth claim as well as the wrongful death claim. He characterizes these as the primary claims because they involved the vast majority of the evidence presented over the course of the eleven-day trial, while the retained gauze issue only comprised about twenty minutes of proof. Dr. Rutledge complains that despite winning on the majority of the issues, the trial court rejected his bill of costs in the Judgment entered March 5, 2024. He properly preserved the issue by filing a CR 59.05 motion to alter, amend, or vacate, and by contemporaneously filing a bill of costs.

This issue, however, was properly handled within the discretion of the trial court. First, a trial court is authorized under CR 54.04(1) to allocate costs under its discretion in the event of a partial judgment or a judgment in which neither party prevails entirely against the other. Here, Dr. Rutledge won on the birth claims but lost on the post-birth retained gauze issue. Thus, neither party prevailed entirely against the other. Based on the record, we cannot say that the trial court's decision was arbitrary, unreasonable, unfair, or unsupported by sound legal principles.

## CONCLUSION

No trial is perfect, but the issues raised here—by multiple competing parties—presented no reversible error. Accordingly, we affirm the trial court on all issues.

ALL CONCUR.

BRIEFS FOR APPELLANTS:

Clayton L. Robinson
Jonathan D. Weber
Ellen L. Black

BRIEF FOR APPELLEES
CHEVANNA WALKER, BRIAN
STEPHENS, AND ANDREW
WALKER, AS ADMINSTRATOR
OF THE ESTATE OF AUBREY
WALKER:

Ann B. Oldfather
Michael R. Hasken
Benjamin F. Hachten
Louisville, Kentucky


BRIEF FOR CROSS-APPELLEE
LAKE CUMBERLAND REGIONAL
HOSPITAL, LLC:

B. Todd Thompson
Eleanor M. B. Davis
Joseph A. Wright
Elizabeth F. Ousley
Louisville, Kentucky